STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

06-1569


RONALD E. CORKERN, III

VERSUS

R. ALLEN SMITH AND STATE OF LOUISIANA, DEPARTMENT OF PUBLIC SAFETY


*************
APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, DOCKET NO. 76997 A
HONORABLE ERIC R. HARRINGTON, DISTRICT JUDGE


**************
SYLVIA R. COOKS
JUDGE
**************


Court composed of Sylvia R. Cooks, John D. Saunders, Michael G. Sullivan, Judges.

Saunders, J., concurs in the result and assigns written reasons.


AFFIRMED.


Edward M. Campbell
1721 Washington Street
Natchitoches, Louisiana 71457
(318) 560-3027
COUNSEL FOR DEFENDANTS/APPELLANTS:
       R. Allen Smith
       Louisiana State Police

Edwin Dunahoe
Dunahoe Law Firm
402 Second Street
P.O. Box 607
Natchitoches, Louisiana 71458-0607
(318) 352-1999
COUNSEL FOR PLAINTIFF/APPELLEE:
       Ronald E. Corkern, III

**COOKS, Judge.**

### STATEMENT OF THE CASE

Trooper R. Allen Smith and the Louisiana State Police appeal a jury verdict in favor of Ronald E. Corkern, III. For the reasons assigned below, we affirm the judgment of the trial court.

### STATEMENT OF THE FACTS

In May 2003, Ronald M. Corkern, III, age twenty-six, began experiencing health problems which prompted him to seek medical treatment. It was discovered he had only one kidney and that kidney was functioning at a severely reduced level. Surgery was performed to create an "AV fistula" in his left arm as a port for kidney dialysis. On May 27, 2003, Ron was discharged from the hospital with instructions to exercise care to protect to the newly-created port.

Three days after his discharge, Ron received a frantic call from his girlfriend, Melinda Thomas advising him her dogs were fighting and she was injured when she attempted to intervene. Ron was nearby and he immediately got into his car to assist her. When he pulled into her driveway and exited the car, he realized State Trooper Allen Smith had been following him. The trooper approached Ron with his pistol drawn. Ron tried to explain to the trooper his girlfriend was injured and he needed to help her. Trooper Smith told him to put his hands where he could see them, which Ron did. The trooper made no attempt to question Ron, ask for his driver's license, or obtain any other information. He simply walked up to the young man, grabbed his left arm at the site of the fistula, threw him to the ground, and handcuffed him. This entire incident was captured by the video camera which was installed in Trooper Smith's police vehicle. Ron was transported to the Natchitoches Parish Sheriff's Office where he was booked and released. By the next morning, Ron's entire upper

2

left arm was bruised and the fistula site was irreparably damaged. Three weeks later, he was hospitalized and a second fistula site was created on his right arm.

Ron sued Trooper Smith and the State of Louisiana, Department of Public Safety, alleging two theories of recovery: (1) the trooper used excessive force in making the arrest; and, (2) the State was negligent in training, monitoring and retaining Trooper Smith. Prior to trial, the Defendants filed motions in limine seeking to exclude Trooper Smith's personnel file and other evidence relating to his conduct as a State trooper. The trial court denied the motion and this court denied the writ, finding no error in the ruling of the trial court. *Corkern v. Smith*, 06-404 (La.App. 3 Cir. 3/23/06). Following trial, the jury awarded Ron $100,000 for physical pain, $250,000 for mental pain and anguish and medical expenses of $8,500. Trooper Smith and the State of Louisiana appeal asserting the following assignments of error:

1. The trial court erred in failing to bifurcate the trial and in admitting evidence of other incidents of misconduct by Trooper Smith while in his official capacity.

2. The trial court erred in failing to apportion any fault to Ron Corkern.

3. The trial court erred in allowing recovery of expert witness fees and the cost of enlarging trial exhibits.

4. The trial court erred in failing to reduce the excessive damage award.

## LAW AND DISCUSSION

*Motion in Limine*

Prior to trial the State filed a motion in limine seeking to exclude Trooper Smith's personnel record. The trial court denied the motion and this court denied writs. The State now re-urges its argument on appeal. The State does not assert the personnel file of Trooper Smith is inaccurate, presents a false representation of his conduct as an officer or that the evidence is irrelevant to the issue of negligent hiring. Instead, the State contends his record, which contains numerous reprimands and

3

suspensions for misconduct, is highly prejudicial and inflamed the jury. The State argues the prejudicial effect of the evidence substantially outweighs its probative value. *See* La.Code Evid. art.403.

In response, Ron asserts this issue has already been resolved and is barred from further review by the law of the case doctrine. Generally, the law of the case doctrine applies to prior rulings of the appellate court and an appeals court will not reconsider its own ruling in the same case. *Gentry v. Biddle*, 05-61 (La.App. 3 Cir. 11/2/05), 916 So.2d 347. However, the application of this doctrine is discretionary and an appellate court may reconsider an issue if the prior decision was "palpably erroneous or its application would result in manifest injustice." *Id.* at 352 (quoting *Griggs v. Riverland Med. Ctr.*, 98-256, p. 6 (La.App. 3 Cir. 10/14/98), 722 So.2d 15, 19, *writ denied*, 99-385 (La. 5/28/99), 735 So.2d 622). Alternatively, Ron argues this evidence, although damaging to the State, is necessary for proof of negligence. We agree.

Ron seeks recovery against the State under the tort of negligent hiring, which is a theory of recovery recognized under La.Civ.Code art. 2315. *Roberts v. Beniot,* 605 So.2d 1032 (La.1991). A duty is imposed upon the State to exercise reasonable care in the hiring, training, and retaining of its officers, who in the performance of their duties, are likely to subject third parties to serious risk of harm. *Id.* Trooper Smith's personnel record is relevant and material to a determination of whether his superiors were privy to and had knowledge of his job performance and whether the State was negligent in hiring training, and retaining him on the force in light of his employment history. In denying the motion in limine, the trial court recognized the evidence was essential for a determination of this issue. The court stated:

> In his petition, plaintiff has alleged that the Trooper was negligently retained as a patrol officer, which falls under the theory of negligent

4

hiring. To attempt to prove this theory, plaintiff must be able to review the Trooper's employment record with the State Police. Because of that, the Court finds that the admission of its employment record for that limited purpose outweighs any risk of prejudice to the jury, and the Motion in Limine is denied. It will be the responsibility of the Court to exercise its supervisory and authority on the admission of this evidence as part of plaintiff's case to see that the probative value outweighs any prejudicial effect.

The jury instruction given by the trial court clarified that Trooper Smith's employment record was to be considered only with regard to the issue of negligent hiring, not whether he used excessive force in making the arrest. The trial court gave the following instruction:

> The Court permitted the matters in Mr. Smith's personnel history as a Trooper to be admitted into evidence for the sole purpose of allowing plaintiff to attempt to establish his allegation that the State of Louisiana was negligent in allowing Mr. Smith to remain as a patrol officer. You are not permitted to use Mr. Smith's personnel history to decide whether he used excessive force in this case. You may only use the matters in his personnel history to help you determine whether the State of Louisiana was negligent in allowing Mr. Smith to remain as a patrol officer.

We have thoroughly reviewed the record and find no error in the decision of the trial court allowing the evidence for the purpose of establishing negligent hiring on the part of the State. Accordingly, we find no error in the ruling of the trial court denying the motion in limine.

The State further contends the trial court should have bifurcated the trial on the two theories of recovery so that the jury could have watched the video of the alleged tort and determined whether the officer used excessive force before the jury was presented with evidence of his personnel record. We have viewed the video of the pursuit and arrest. Ironically, the video tape alone, without Trooper Smith's personnel record, was sufficient evidence for the jury to conclude Trooper Smith was negligent, even willful, in his handling of the situation, used excessive force in making the arrest and was completely responsible for the resulting damages.

5

Bifurcating the trial on the two theories of recovery would not necessarily have benefitted the State's case. We find no merit this argument.

*Comparative Fault*

The State asserts the jury erred in failing to assess fault on the part of the Plaintiff. Comparative fault is an affirmative defense and the party asserting it bears the burden of proving, by a preponderance of the evidence, that the negligence of the plaintiff was a cause-in-fact of the injury. *Trahan v. Savage Indus, Inc.*, 96-1239 (La.App. 3 Cir. 3/5/97), 692 So.2d 490. In determining fault, the jury must consider the conduct of each of the parties and the causal relationship between the conduct and the damages. Several factors are to be considered: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of each of the parties, whether superior or inferior; and (5) any extenuating circumstances which might require the party to proceed in haste, without proper thought. *Watson v. State Farm Fire and Casualty Ins. Co.*, 469 So.2d 967 (La. 1985); *Campbell v. Louisiana Dep't of Transp. & Dev.,* 94-1052 (La. 1/17/95), 648 So.2d 898. The State contends Ron was at fault in failing to stop his vehicle when he discovered Trooper Smith was following him and in failing to mitigate his damages by not seeking immediate medical attention for the damaged port site.

The jury assessed the fault of the parties based, in part, on the video tape of the incident. The video tape does not support the State's arguments in brief. Contrary to the State's assertion, Trooper Smith did not have his siren on when he was following Ron. When they arrived at Melinda's home and Ron exited his vehicle, his hands were in complete view of the trooper. Again, contrary to the State's assertion, it does not appear Ron was reaching for a gun or that he was making any other

6

threatening move. Ron is a young, slightly built man. When he got out of his car, he appeared to be pointing to his girlfriend's house presumably trying to explain the situation involving the dogs. Trooper Smith approached with his gun drawn. He holstered his pistol ,and without hesitation or explanation, he grabbed Ron's left arm, threw him to the ground, pulled his arms behind his back and handcuffed him. Trooper Smith did not speak to Ron, ask for his name, license or vehicle registration documents. Melinda came out of the house and she also attempted to explain that her dogs were fighting and she was bitten. Trooper Smith told her if she was in trouble, she should have called 911. Ron related to the trooper he had just had surgery on his arm. Trooper Smith appeared completely unaffected by the emergency presented by the dogs or the explanation of events given by Ron or Melinda. Ron was placed in the police car and transported to the station.

In addition to the video tape, the jury heard the testimony of Mr. Harold Warren, a retired assistant chief of police of the City of Dallas, Texas. Mr. Warren was accepted by the court as an expert in the use of force and in the administration, supervision and discipline of law enforcement personnel. Mr. Warren worked his way up from patrol officer to assistant chief of police in charge of 140 police officers and was responsible for analysis and review of pursuits and use of force. In addition, Mr. Warren was an instructor at the Dallas Police Academy, the North Central Texas Regional Police Academy and the FBI Academy. Mr. Warren reviewed the evidence, including the videotape of the pursuit and "take down" and testified there was no indication that any force was necessary to effect the arrest of Ron Corkern. According to his review of the tape, he concluded Ron was completely compliant and offered no resistence. He also confirmed, contrary to Trooper Smith's report, that there was no attempt to reach for a gun or any aggressive action or any action which

7

could be interpreted as aggressive on the part of Ron. Mr. Warren testified Ron's actions were consistent with his testimony and consistent with the actions of a normal individual who was at the point of a gun. He complied with all orders given by Trooper Smith while, at the same time, attempting to explain the circumstances of the situation. Mr. Warren concluded it was unnecessary to throw Ron to the ground in order to handcuff him. He stated based on the video and the totality of the circumstances, Trooper Smith failed to properly assess the situation and used excessive force in making the arrest.

The jury was presented with evidence of Trooper Smith's record as an officer. According to his record, Trooper Smith was reprimanded multiple times for various infractions, including failure to respond to an automobile accident as directed by his superiors, failing to pay for gasoline at a service station, and failing to keep his gun in working order. He was also suspended for hiding personal belongings from the family of a deceased accident victim and filing a false report regarding the items. In 2000, during the course of an arrest, Trooper Smith kicked an individual in the head and broke his jaw.

In assessing fault, the jury heard the testimony of the Plaintiff and his father, Ron Corkern, Jr. Ron stated he did not notice he was being followed by a police officer. He was totally focused on reaching his girlfriend's home as quickly as possible to assist her. Ron attempted, without success, to explain to Trooper Smith he was there to help his girlfriend. The jury concluded it was not unreasonable to believe the exigency of the circumstances justified Ron's failure to observe Trooper Smith behind him.

The State contends Ron was at fault in failing to secure medical treatment and instead went on a planned trip to Florida. The testimony indicates Ron did seek

immediate medical attention following the incident. Ron's father contacted his son's two treating physicians to notify them of the damaged fistula site. He was told there was nothing that could be done to salvage the fistula site and surgery would have to be scheduled to insert a new port. The physician advised Mr. Corkern surgery could be performed when Ron returned from a long-standing planned family vacation to Florida. Ron was evaluated by his physician immediately upon his return and on July 21, 2003 he was hospitalized for the creation of another AV fistula port.

In determining the issue of comparative fault, the jury weighed the fault of both parties and concluded Ron's failure to stop or observe Trooper Smith's vehicle resulted from extenuating circumstances which required him to proceed in haste. The record supports a finding by the jury that the injury to Ron which followed was solely a direct result of Trooper Smith's negligence. We, therefore, find no error in the decision of the jury concluding Ron was free of fault in causing his damages.

*Damages*

The State argues the damage award is excessive. The jury awarded Ron $100,000 for physical pain and $250,000 for mental pain and anguish. The jury heard medical testimony regarding the consequences of damaging a kidney dialysis port site on a young man of twenty-six who is in chronic renal failure.

Dr. Stephen W. Wheat, an internal medicine specialist, testified he first examined Ron on May 19, 2003, with complaints of joint pain and muscle cramps. Dr. Wheat initially thought, because Ron was only twenty-six years old, that the symptoms were consistent with rigorous exercise. Blood tests were performed and Dr. Wheat found "low and behold, his creatinine, which is a judge of kidney function, was through the roof. And immediately, I said, 'Oh, my God.' We have a twenty-six year old man that needs dialysis, basically." It was discovered Ron had only one

9

kidney and that kidney was congenitally smaller and was not functioning properly. A stent was immediately placed in the urethra and Ron was administered medication to prevent clotting in the stent and to prevent infection. He was referred to a general surgeon.

Dr. Gazi Zibari, a general surgeon and organ transplant specialist, stated he vividly remembers Ron because it was an unusual situation for a young, and otherwise healthy, individual to be in need of an organ transplant. Dr. Zibari explained the procedure for the creation of a port for dialysis. In Ron's case, surgery was performed on his left arm to divert blood from the brachial artery into a vein. The goal is to create a vein or conduit where at least 150 to 400 cc's of blood per minute can flow through. Normally, a vein will not have that much blood flow. But once the blood flow is diverted from the artery, the vein increases in size and becomes stronger. The contaminated blood is taken from the site through a needle, cleaned in the dialysis machine and then placed back into the vein, through another needle, higher up toward the heart.

Dr. Zibari explained after surgery is performed to divert the blood flow, it takes anywhere from four weeks to three months for the vein to develop to a point where it can be used for dialysis. However, even the successful creation of a port site can result in complications. Dr. Zibari testified the port site "[m]ay develop aneurysm in the patient, infection, thrombosis, you know, erosion through the skin. Because you're sticking this vein three times a week. You're subjecting this vein, or this prosthesis. And every time you put the needle in it, you subject it to risk of thrombosis, risk of aneurysmal development, risk of skin erosion."

Dr. Zibari testified a port site has a life expectancy of two and half to three years for individuals who undergo dialysis. He underscored it is important to guard

the port site because it is inevitable a port site will fail and an individual will eventually "run out" of port sites.  He testified Ron's optimum solution is to find a kidney donor.  However, there is a danger that he may be unable to find a suitable donor match before he exhausts the supply of available port sites for dialysis.  If this happens, dialysis is no longer a treatment option.  Dr. Zibari testified he "was advocating finding him a living donor.  If he would have a living donor, maybe we would not have to subject him to these other operations."  The loss of one of these sites can essentially reduce someone's life expectancy by several years. He testified a young man of twenty-six would have a greater risk of significant consequences because of the loss of a port site than would an older person.

Dr. Zibari testified since the first site was irreparably damaged he performed an additional surgery on July 21, 2003 to create a right AV fistula site for dialysis. However, because this site had not matured at the time dialysis was scheduled to begin in September, an additional surgery was required to place a central line into Ron's chest with a "pigtail" device to have dialysis administered through that site. The right port site eventually matured and dialysis was initiated in October 2003.

Dr. Wheat saw Ron again in February 2006 when he came in with multiple complaints.  At that time, Ron had been undergoing dialysis for approximately three years.  Dr. Wheat evaluated his condition:

> [D]ialysis can be very hard on people, and he was having some problems with it, and it was – sometimes the initial stages of dialysis are really kind, and then it just ain't worth a flip, and that's – we're having some problems, and it's not worth a flip with him, and we're looking at transplanting right now, and that's kind of what we're trying to find, is the best place to transplant, you know, or – and who is going to be – and, you know, you're got everything from matches to, you know, location.
> . . . .
> If he's going to assume a normality of life, he's going to need a kidney transplant, I think, because he's really now at a point with his – where the dialysis is not — it's not what it used to be.  He doesn't feel good .

11

. . and he's looking at the rest of his life feeling like this and that's just not an – it shouldn't be an option for him.

The findings of a jury are entitled to great weight and will not be overturned on appeal unless manifestly erroneous or clearly wrong. *Wainwright v. Fontenot*, 00-492 (La. 10/17/00), 774 So.2d 70. The supreme court has recognized the "role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration." *Youn v. Maritime Overseas Corp.,* 623 So.2d 1257, 1260 (La.1993), *cert. denied*, 510 U.S. 1114, 114 S.Ct. 1059 (1994).

In this case, the Plaintiff was a twenty-six year old who was rushing to the aid of his girlfriend. Just three days prior to the incident, he had undergone surgery to establish a port site for kidney dialysis. He was still assimilating the news of his medical condition and his need for dialysis for the rest of his life. The jury heard the medical testimony regarding the consequences of a damaged port site. The jury also heard the testimony of the Plaintiff, who fully understands the consequences of losing the site on his left arm and, as a result, lives in constant apprehension. The jury assessed the actions of Trooper Smith who made no attempt to question Ron or listen to his plea regarding the danger to his girlfriend. He drew his pistol, grabbed Ron's left arm and threw him to the ground irreparably damaging a port site. We do not find the jury was clearly wrong in awarding Ron $350,000 for physical and mental pain and suffering given the "effects of the particular injury to the particular plaintiff under the particular circumstances." *Id.* at 1261.

*Expert Witness and Exhibit Fees*

The State disputes two items of costs assessed against it. The first is the expert

12

witness fee of Harold Warren in the amount of $4,218.00 and the second is $1,916.00 paid to SCI Communications, Inc. for a trial exhibit. The trial court held a hearing on the Motion to Tax Costs. The record reflects Mr. Warren was accepted by the court as an expert in administrative police procedures and use of force. His time was documented and his fees were reviewed by the trial court at the hearing. We find no error in the decision of the trial court.

The State contends the cost paid to SCI Communications, Inc. for a trial exhibit is unreasonable. We disagree. A trial court has great discretion in fixing fees for expert witnesses and determining the reasonableness of costs incurred by the prevailing party. *Otwell v. Diversified Timber Services, Inc.*, 04-924 (La.App. 3 Cir. 1/26/05) 896 So.2d 222. In this case, we do not find an abuse of discretion by the trial court.

## DECREE

Based on the foregoing review of the evidence, we affirm the judgment of the trial court. All costs of this appeal are assessed against R. Allen Smith and the State of Louisiana, Department of Public Safety, Louisiana State Police.

**AFFIRMED.**

13

NUMBER CA 06-1569

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

RONALD E. CORKERN, III

VERSUS

R. ALLEN SMITH AND STATE OF LOUISIANA, DEPARTMENT OF PUBLIC SAFETY

SAUNDERS, J., concurs.

This is a case in which Plaintiff, Ronald M. Corkern, Jr., was injured when he was approached and arrested by Louisiana State Trooper R. Allen Smith following a high-speed car chase on May 30, 2003. Plaintiff testified that he was responding to a frantic phone call he had received from his girlfriend, advising him that she had been bitten by one of her dogs when she attempted to intervene in a dog fight, and that he did not notice that Trooper Smith was following him until he arrived at her home. Plaintiff attempted to explain the situation. Trooper Smith proceeded to arrest Plaintiff. During the arrest, Trooper Smith allegedly grabbed Plaintiff's left arm, at the site of a fistula, where a port had been inserted for kidney dialysis only three days prior to the incident. As a result, Plaintiff's fistula site was irreparably damaged, and a second fistula site had to be created.

Plaintiff subsequently brought a claim against Trooper R. Allen Smith and the State of Louisiana, Department of Public Safety, alleging the use of excessive force in making an arrest, as well as negligence in training, monitoring, and retaining Trooper Smith.

I write further to discuss the issue of bifurcation of trial, which is argued

strenuously by the State. It is my view that bifurcation of trial is not appropriate due to the fact that the State is alleging comparative fault as an affirmative defense. In this case, Plaintiff filed suit asserting two causes of action: 1) the use of excessive force by Trooper Smith during arrest and 2) Negligence in hiring, training, and retaining patrol officer. Defendants argue that the trial should be bifurcated because once excessive force is proven, the claim of negligent hiring is irrelevant and only serves to inflame the jury. In defending against Plaintiff's claim, Defendants have alleged comparative fault as an affirmative defense. In this case, Defendants' fault is comprised not only of the alleged excessive force exercised during the arrest by Trooper Smith, but also the alleged negligence of the Department of Public Safety in retaining Trooper Smith despite his past behavior on the force. It is necessary to weigh *all* of the fault of the Defendants, both the negligence in hiring and the excessive force claims, against the fault of the Plaintiff in order to make a determination of the allocation of fault between all parties involved. La.Civ.Code art. 2323. The court in *Landry v. Bellanger*, 02-1443 (La. 5/20/03), 580 So.2d 923, explains that art. 2323 "clearly requires that the fault of the every person responsible for a plaintiff's injuries be compared regardless of the legal theory of liability asserted against each person. *Dumas v. State*, 02-0563 (La.10/15/02), 828 So.2d 530)." *Id*. at 952. Therefore, Department's alleged negligence in hiring, training, and retaining Trooper Smith is, indeed, relevant, and bifurcation of trial is not appropriate.