# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 04-1425 C/W 04-1578

**CHARLES WILLIAM MASSIE, III**

**VERSUS**

**Z. DAVID DELOACH, ET AL.**

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF VERMILION, NO. 00-74195,
HONORABLE MARILYN C. CASTLE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Jimmie C. Peters, and Marc T. Amy, Judges.

**AFFIRMED.**

**Patrick Moresi**
**Attorney at Law**
**Post Office Box 1140**
**Abbeville, LA 70511-1140**
**(337) 898-0111**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
     **Charles William Massie, III**

**Randolph J. Waits**
**Sherri L. Hutton**
**Matthew F. Popp**
**Emmett, Cobb, Waits & Kessenich**
**1515 Poydras Street, Suite 1950**
**New Orleans, LA 70112**
**(504) 581-1301**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
     **Z. David Deloach, et al.**

PETERS, J.

The plaintiff, Charles William Massie, III, has timely appealed two separate trial court judgments, and we have consolidated those appeals for consideration by this court. For the following reasons, we affirm both trial court judgments in all respects.

## DISCUSSION OF THE RECORD

Charles William Massie, III, owns approximately 1,620 acres of immovable property in Vermilion Parish, Louisiana. The southern boundary of the land is the Intracoastal Waterway, a man-made navigation canal which runs along the Louisiana coast. The Intracoastal Waterway (hereinafter sometimes referred to as "the canal") is highly trafficked by commercial vessels and has irregular banks, some of which were created by the deposit of spoil from the original dredging by the Corps of Engineers in 1947. These banks act as protection levees for the adjacent land; vary in height from two to ten feet above the water level; and suffer from erosion caused by wind, rain, tides, currents, and boat traffic.

This litigation arises from a March 22, 1999 incident which occurred as the M/V *Trey Deloach*, a tugboat, pushed two barges west on the canal. Less than a mile west of the point where Massie's land intersects the canal, the waterway narrows into what is referred to in Intracoastal jargon as the "Forked Island Wiggles." This canal configuration is such that vessels are often required to stop and wait for incoming traffic to pass before proceeding forward. On March 22, 1999, the captain of the M/V *Trey Deloach* found himself in such a situation and decided to hold up and wait for several tows to pass before entering the section. As the M/V *Trey Deloach* reversed its engines and stopped its tow, the southwest wind pushed the vessel to the northeast bank, and the lead barge nosed against the bank.

At about the same time that the M/V *Trey Deloach*'s lead barge nosed into the bank, Bethel Dyson, Massie's friend and neighbor, was crossing the Forked Island Bridge over the Intracoastal Waterway and observed the barge's movement. He immediately informed Massie of what he had observed, and the two men proceeded to the canal, where Massie took pictures of the scene and instructed the captain of the M/V *Trey Deloach* to leave. The damage caused to the bank by the incident gave rise to this litigation.

Massie initially instituted suit to collect for his property damage on March 21, 2000, and through subsequent amendments named as defendants Edmo Valley Towing Company (Edmo Valley), the owner of the M/V *Trey Deloach*, and the owner's insurer, Redland Insurance Company. Additionally, Massie sued the vessel *in rem.*

Following a two-day trial which began on May 26, 2004, the trial court rendered judgment in Massie's favor and against the defendants, awarding Massie $4,800.00 in damages. However, the trial court deferred to a future date the assessment of court costs and the determination of whether the award should accrue interest. The trial court executed a judgment to this effect on June 15, 2004, and this judgment forms the basis of Massie's first appeal.

The hearing to tax costs and to calculate accrued interest occurred on October 18, 2004, at which time the trial court determined the total court costs to be $9,642.65 and assessed all but $312.50 of that total to Massie. Additionally, the trial court awarded Massie $1,380.19, representing judicial interest[1] on the award of damages.

---

[1] The judicial interest award is not at issue in this appeal.

The trial court executed a judgment to this effect on October 29, 2004, and this judgment forms the basis of Massie's second appeal.

In these separate appeals, Massie assigns one error each:[2]

> FIRST APPEAL:  The trial court erred when it awarded appellant damages not based on evidence in the record, but rather based on its own valuation of plaintiff's damages.

> SECOND APPEAL:  The trial court abused its discretion when it awarded excessive witness fees to defendants' two (2) experts based on their meeting with counsel and preparatory work, and whose testimony was largely rejected at trial.

## OPINION

### *Assignment of Error in First Appeal*

The property damage principles found in La.Const. art. I, § 4; La.Civ.Code art. 2315; and *Coleman v. Victor*, 326 So.2d 344 (La.1976), all foster the goal of compensating a victim to the full extent of his loss and restoring him to a position as good as he held prior to the damage. *Roman Catholic Church v. La. Gas Serv. Co.*, 618 So.2d 874 (La.1993); *Massie v. Cenac Towing Co.*, 00-1596 (La.App. 3 Cir. 4/25/01), 796 So.2d 14, *writ denied*, 01-1511 (La. 8/31/01), 795 So.2d 1213.  An appellate court may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Henderson v. Nissan Motor Corp. U.S.A.*, 03-606 (La. 2/6/04), 869 So.2d 62.

There is no dispute on appeal that on March 22, 1999, one of the M/V *Trey Deloach*'s barges struck the bank of the Intracoastal Waterway and that the point of impact was on Massie's land.  The dispute centers around the trial court's finding as

---

[2]The appeals are consolidated.  Our opinion will be rendered in the appeal of the judgment on the merits, *Massie v. Deloach*, 04-1425 (La.App. 3 Cir. __/__/05), ___ So.2d ___.  A separate judgment will be rendered in the appeal of the judgment on the rules to tax costs, *Massie v. Deloach*, 04-1578 (La.App. 3 Cir. __/__/05), ___ So.2d ___.

to the extent of the damage sustained and the amount of compensation the trial court awarded. The trial court awarded Massie compensation based on its conclusion that only fifty feet of the bank was damaged by the impact and that it could be repaired for $96.00 per foot, or a total of $4,800.00. On appeal, Massie contends that the trial court erred in its determination of both the extent of damage and the cost of repair.

At trial, the trial court was presented with the testimony of a number of witnesses, including three expert witnesses: Richard Leonard, a River Ridge, Louisiana expert in the field of the stabilization and restoration of banks and levees on Louisiana waterways who testified for Massie; Anthony Joseph Zelenka, a Jefferson, Louisiana soil condition and remediation cost expert who testified for the defendants; and Joseph Elray Schexnaider, an Abbeville, Louisiana consulting engineer who testified for the defendants.

In presenting their testimony, the witnesses, and particularly the experts, had the benefit of two sets of photographs introduced into evidence, which purported to depict the area of the bank at issue. The first set of photographs was taken by Massie on the day of the incident from a skiff located in the canal adjacent to the damaged bank. Some of these photographs depicted three small trees with green foliage down in the water and another tree leaning toward the water with its roots exposed. Other photographs in this set displayed several linear feet of bank having a steep slope of bare and crumbling earth.

The other set of photographs was taken in June of 2000 by Zeland David Deloach, the owner of Edmo Valley. These were also taken from a skiff in the canal and depict Massie pointing out the area to be photographed. They cover an unknown

4

distance along the bank and were taped together to form a panoramic view. Several separate areas of bare earth and steep slopes are visible through the foliage.

At trial, and with the use of these two sets of photographs, Massie attempted to identify the area he claims was damaged by the barge as extending 155 feet along his property line. He testified that he initially estimated the linear feet of damage to be approximately ninety feet but that two years later he measured it and found it to be 155 feet. Both he and Dyson stated that the barge hit the bank at multiple points as it bounced along Massie's property before coming to a stop.

Leonard testified that he did not become involved in the litigation until June 27, 2001, and first visited the site in September of 2001. He observed the damaged bank from a skiff in the canal, took no measurements, and relied on Massie's 155-foot estimation in reaching his conclusion with regard to the total cost of repair. According to Leonard, the wave action along the entire bank of the Intracoastal Waterway causes erosion and the falling of banks into the canal itself. This in turn causes trees, root systems and all, to collapse into the waterway. According to Leonard, spoil banks, such as the one damaged herein, are extremely important to the stability of the waterway because as they become settled by tree roots and other vegetation, they become "permatized."

Leonard testified that once a levee has been damaged, it can best be restored to its previous "permatized" condition by laying down a matting of geotextile fabric and covering the matting with riprap. According to Leonard, this would not stop the erosion, but would retard the erosion much like the vegetation had done before being damaged. He reached the conclusion that the downed trees depicted in the photographs had fallen into the water as a result of an impact, and not normal erosion,

5

based on his observation that the trees themselves were damaged. Accepting Massie's 155-foot damage estimate, and rounding it off to 150 feet, Leonard calculated the cost of restoration to be $74,000.00.

Zelenka visited the site in October of 2002, and, in addition to viewing the bank from a skiff, went ashore and examined the bank itself. Based on his personal investigation and his examination of the photographs, he concluded that the unstable conditions he observed were caused by erosion, and not an impact. On the subject of repair of eroded banks, Zelenka agreed with Leonard that matting and riprap is the better repair method, but he opined that, in Massie's case, such work would amount to an improvement rather than a restoration. Noting that Massie's property had no protection against erosion in the first place and that it was simply an unstable bank line, Zelenka testified that an earthen repair with coconut matting would restore the bank to its condition prior to the incident. He further testified that, assuming this form of repair were accomplished, the bank would continue to erode just like the bank it replaced, because whatever material was put there was going to always find its natural repose. Assuming 155 feet of damage based on Massie's estimate, and rounding it off to 150 feet, Zelenka testified that the cost of repair using his method of repair would be $15,000.00.

Schexnaider was present when the October 2002 pictures were taken. He testified that, based on his observations, there was no difference between the bare earth spots pointed out to him as being the point of impact and other bare earth areas along the levee attributable to natural erosion. Schexnaider described the bank or levee along Massie's property as an aggregate of spoil piles and stated that, based on his extensive familiarity with the Intracoastal Waterway, the prevailing southeast

6

winds at the accident site have historically caused a washing along the bank. In fact, according to Schexnaider, between 1950 when the Intracoastal Waterway was originally dug, and the present time, the canal had widened from 185 feet to 330 feet through the continual washing process. Like Zelenka, Schexnaider saw exposed roots of trees and trees falling into the water as effects of erosion and collapse of the overburden typical of the Intracoastal Waterway's banks, and not as a result of the barge damage. Specifically, he did not believe that trees and vegetation resulted in permatization of these levees.

As previously stated, the trial court concluded that the barge being pushed by the M/V *Trey Deloach* did strike Massie's shoreline, and that factual determination is not at issue in this appeal. Once the trial court resolved this issue, it then determined the remaining issues: the extent of damage to Massie's land and the cost of repair. In resolving these issues, the trial court rejected Massie's assertion that the barge caused damage along 155 feet of the shoreline and concluded instead that the contact between the barge and the shore was a "very minimal occurrence" which resulted in "the loss of a couple of trees and probably some soil in conjunction with those trees." Specifically, the trial court determined that the barge caused damage to fifty feet of the shoreline and awarded $4,800.00 to repair that damage. In determining the cost of repair, the trial court accepted Zelenka's $96.00-per-foot repair estimate.

On appeal, Massie argues that once the trial court determined that contact to the land was made by the barge, it had to accept his 155-foot estimation because that was the only evidence of record. Massie also argues in brief that, because all of the experts based their repair estimates on either 150 or 155 feet of damage, "[u]nder no

7

circumstances should the trial court have awarded appellant less than the earthen repair estimate offered by defendants' expert, *i.e.*, $15,000.00." Massie's reasoning in this regard is that, based on 150 or 155 feet of damage, the repair estimates ranged from a high of $74,000.00 and a low of $15,000.00. Therefore, according to his argument, the trial court, in awarding only $4,800.00 based on only 50 feet, departed from the experts' evaluations and made its own evaluation without regard to the evidence. We reject both of these arguments. The photographs reflect several bare earth spots, all of which Massie claimed were caused by the barge, and the expert testimony is in conflict concerning whether these bare spots resulted from natural erosion or vessel impact. The trial court made factual determinations with regard to the extent of damage, and we find no manifest error in those factual findings.

Additionally, in support of his argument that the damage award is too low, he calls our attention to our decision in *Massie*, 796 So.2d 14, wherein this court affirmed a $30,500.00 award to him for similar damage caused by another towing company to fifty feet of his bank. However, although we affirmed that award, we did so with the observation that the damages "seem[ed] high"and that "it is hard to imagine that the retention of any fifty foot segment of the bank could be worth $30,500." *Id.* at 18. Nevertheless, because we noted that there was only one expert in the case, that his testimony was favorable to Massie, and that the defendants offered no testimony or evidence in contradiction, we had no choice but to decide the case as an affirmation.

In the present case, there was extensive expert testimony adding a new dimension to our understanding of the proclivities of the banks of the Intracoastal Waterway in this area. This expert testimony convinced the trial court that the

damage was minimal and could be fairly repaired for $96.00 a foot instead of the $610.00-per-foot award made in the earlier case. In fact, the trial court specifically stated that it was more impressed with the expert testimony presented by the defendants than that presented by Massie.

The cost-of-repair issue, just as the extent-of-damage issue, involved the effect and weight to be given the expert testimony. As the supreme court explained in *Middle Tennessee Council, Inc. v. Ford*, 274 So.2d 173 (La.1973), the effect and weight to be given expert testimony depends upon their qualifications and the facts upon which the experts base their opinions. "The weight to be given expert testimony is dependent upon the professional qualifications and experience of the expert and especially on the facts on which that expert's opinion is based." *Head v. Head*, 30,585, p. 5 (La.App. 2 Cir. 5/22/98), 714 So.2d 231, 234. Recognizing the trial court's consideration of the expert testimony as well as giving the same deference to the trial court in the instant case as we did in the first *Massie* decision, we find no manifest error in the trial court's factual conclusions. Therefore, we affirm the trial court's award of $4,800.00

### *Assignment of Error in Second Appeal*

On April 19, 2001, counsel for the defendants tendered Massie an offer of judgment pursuant to La.Code Civ.P. art. 970, wherein it offered to settle all claims arising from the March 21, 2000 incident for $10,000.00. Massie rejected this offer. At the October 18, 2004 hearing, the trial court taxed Massie with $9,642.65 in court costs. The trial court did so because the ultimate judgment rendered was less than twenty-five percent of the $10,000.00 offer tendered by the defendants on April 19, 2001. *See* La.Code Civ.P. art. 970(C). In this assignment of error, Massie challenges

9

that portion of the total attributed to Schexnaider's expert witness fee ($2,970.00) and Zelenka's expert witness fee ($4,000.00). Massie does not dispute the application of La.Code Civ.P. art. 970(C), assuming we choose not to increase his quantum award, but instead asserts that the trial court awarded excessive expert witness fees.

Zelenka billed the defendants $14,812.50 for his services, yet the trial court awarded an expert witness fee of only $4,000.00. He was present throughout the two-day trial and spent several hours doing preparatory work. The preparatory work included visits to the site from his home in Baton Rouge and views from the water and on shore. The trial court found that this expert's testimony was particularly helpful in terms of what caused the damage. For similar work and time spent, the court awarded $2,970.00 to Schexnaider.

Expert witnesses are entitled to be compensated for their services in an amount to be determined by the court and taxed as costs to be paid by the party cast in judgment. La.R.S. 13:3666. "The fixing of expert witness fees is largely within the sound discretion of the trial court, and, on appeal, we may not reverse the trial court's fixing thereof absent an abuse of discretion." *Trans La. Gas Co. v. Heard,* 629 So.2d 500, 505 (La.App. 3 Cir. 1993). In fixing expert witness fees, each case must turn on its own peculiar facts and circumstances, but factors that may be considered are the amount of time spent in preparing for trial; time actually spent in court; the extent and nature of the work performed; and the knowledge, attainments and skill of the expert. *Id.* Additional considerations include the awards to experts in similar cases, the complexity of the problem addressed by the expert, and the helpfulness of the expert's report and testimony to the trial court. *Prestridge v. Elliott*, 03-94 (La.App. 3 Cir. 6/4/03), 847 So.2d 789.

We find no abuse of discretion in the award of these two expert fees.

## DISPOSITION

For the foregoing reasons, we affirm the trial court judgments in all respects.

We tax all costs of this appeal to Charles William Massie, III.

**AFFIRMED.**