STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 09-1327 consolidated with CA 09-1328


BARBARA RAYMOND

VERSUS

GOVERNMENT EMPLOYEES INSURANCE COMPANY, ET AL.


**********

APPEAL FROM THE
TENTH JUDICIAL DISTRICT COURT
PARISH OF NATCHITOCHES, NO. C-75353 C/W C-75373
HONORABLE DEE A. HAWTHORNE, DISTRICT JUDGE

**********

BILLY HOWARD EZELL
JUDGE

**********

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and J. David Painter, Judges.

AFFIRMED.

Otis Edwin Dunahoe, Jr.
Dunahoe Law Firm
P. O. Box 607
Natchitoches, LA 71458-0607
(318) 352-1999
Counsel for Plaintiff/Appellee:
Barbara Raymond

**Jeffrey Howerton Thomas**
**Thomas Law Firm**
**P. O. Box 2177**
**Natchitoches, LA 71457-2177**
**(318) 352-6455**
**Counsel for Defendants/Appellees:**
**Brandon Raymond**
**Randon Raymond**

**Edward M. Campbell**
**Special Assistant Attorney General**
**1721 Washington Street**
**Natchitoches, LA 71457**
**(318) 560-3027**
**Counsel for Defendant/Appellant:**
**Louisiana State Department of Transportation and Development**

**EZELL, JUDGE**.

This appeal involves the allocation of fault between a driver and the Louisiana State Department of Transportation and Development (DOTD) for a collision that occurred on Louisiana Highway 117 in Natchitoches Parish. As a result of that accident, Edward Raymond was killed. Other issues raised include the failure to strike several jurors for cause, the refusal to allow a witness to testify, the award of damages, and the assessment of expert witness fees and costs of evidence used at trial.

## FACTS

During the morning on October 25, 2002, Edward Raymond was traveling in a northerly direction on Louisiana Highway 117, returning to his home in Natchitoches from his job as a firefighter at Fort Polk. At the same time, Stephen Taylor was traveling in a southernly direction on Highway 117. Mr. Taylor began to pass a logging truck in front him. During the passing maneuver, Mr. Taylor observed Mr. Raymond coming up the highway. At the same time, both vehicles attempted to avoid a collision and headed for the eastern shoulder. The vehicles collided on the shoulder. Mr. Raymond died as a result of the accident.

Mr. Raymond's wife, Barbara, filed suit for damages on her own behalf and on behalf of her two minor children, Lauren and Kayleon. An additional suit was also filed by Dorothy Simmons as the guardian of her two minor children, Brandon and Randon, who were Mr. Raymond's twin sons from a previous relationship.[1] Named as defendants were Mr. Taylor, Government Employees Insurance Company, and State Farm Mutual Automobile Insurance Company. Later, the DOTD was added as a defendant.

_____

[1] By the time of trial, Brandon and Randon had reached the full age of majority, so they were substituted as plaintiffs in place of their mother.

1

In 2005, the two cases were consolidated for trial. After a jury was chosen, trial proceeded on October 6 through 8, 2008. The jury returned a verdict finding Mr. Taylor seventy-five percent at fault for the accident and the DOTD twenty-five percent at fault. The jury made the following awards of damages: (1) $5,421.20 for funeral expenses; (2) $1,904.00 for medical expenses; (3) $1,514,747.79 for loss of past earnings, future earnings, and earning capacity; (4) $50,000.00 for the conscious pain and suffering and anguish of Mr. Raymond; (5) $1,500,000.00 for the damages suffered by Barbara Raymond for the loss of her husband; and (6) $750,000.00 to each of the four children for the loss of their father.

The DOTD filed the present appeal asserting numerous assignments of error. The DOTD first claims that it was error for the trial court to refuse to remove certain jurors for cause. The DOTD also claims that it was error for the trial court not to properly admonish the jury to disregard statements pre-judging the road. The DOTD argues that it should have been allowed to call Dorothy Simmons as a witness. The DOTD has also alleged that it should not be found liable as there was no notice of a defect on the highway as required by La.R.S. 9:2800. The DOTD further argues that it should not have been apportioned any fault because the absence of a "no-passing zone" sign was not a legal cause of the accident. The DOTD claims that the damages awarded were excessive and that the trial court should have granted its motion for judgment notwithstanding the verdict, new trial, or remittitur. Finally, the DOTD argues it was error for the trial court to award the Plaintiffs all the charges billed by the expert witnesses and copy shops for the costs of enlarging exhibits.

**JURORS**

The DOTD takes issue with the trial court's failure to refuse to strike for cause three of the jurors. It claims that Edward Braxton should have been excused because

he had consulted with one of the Plaintiffs' attorneys on two different occasions. The DOTD also complains that Kay Gilson and Joseph Gay should have been stricken for cause because they were of the opinion that Highway 117 was a terrible road.

Louisiana Code of Civil Procedure Article 1765(2) provides that a juror may be challenged for cause "[w]hen the juror has formed an opinion in the case or is not otherwise impartial, the cause of his bias being immaterial." Article 1765(3) further provides that a juror may also be challenged for cause "[w]hen . . . enmity between the juror and any party or his attorney are such that it must be reasonably believed that they would influence the juror in coming to a verdict."

A trial court has great discretion in ruling on challenges for cause and the appellate court should not disturb its ruling unless the voir dire as a whole indicates an abuse of discretion. *Bannerman v. Bishop*, 28,382 (La.App. 2 Cir. 7/2/96), 688 So.2d 570, *writ denied*, 96-2755 (La. 1/10/97), 685 So.2d 146. A prospective juror's friendship, acquaintance, or previous employment of an attorney on an unrelated matter does not necessitate the granting of a challenge for cause if the juror makes it clear that such a relationship would not affect his or her verdict. *In re Medical Review Panel on Behalf of Laurent*, 94-1661 (La.App. 1 Cir. 6/23/95), 657 So.2d 713. Also, a juror's preconceived notions about the dangerousness of a highway does not necessitate a challenge for cause if the juror states that it will not affect his or her ability to judge the case fairly. *Himel v. State ex rel. Dept. of Transp. and Dev.*, 04-274 (La.App. 5 Cir. 10/12/04), 887 So.2d 131, *writ denied*, 04-2802 (La. 3/18/05), 896 So.2d 999.

We first observe that Ms. Gilson was never accepted as a juror as the jury was seated before her name came up. Therefore, we need not address the arguments regarding her.

3

On voir dire, Mr. Braxton stated that he talked to Mr. Dunahoe, Mrs. Raymond's attorney, about handling two separate cases, one for his daughter and one for him. However, Mr. Dunahoe never represented them. The DOTD peremptorily challenged Mr. Braxton after the trial court found that Mr. Braxton could be impartial upon further questioning. We find no abuse of discretion by the trial court in failing to excuse Mr. Braxton for cause.

Mr. Gay did state that Highway 117 was a terrible road. However, when questioned by the trial court, he also stated that he could give each side a fair shot. We find no abuse of discretion by the trial court in failing to excuse Mr. Gay for cause.

The DOTD also argues that it was error for the trial court not to admonish the jury to disregard statements by prospective jurors in voir dire who had pre-judged Highway 117. First, we do not see where there was a request to the court by the DOTD to admonish the jury. Furthermore, it is evident from a reading of the colloquy of the questioning of the potential jury members that they were advised and agreed they could judge the evidence fairly to both sides regardless of their own personal opinions of the road. This assignment of error has no merit.

**TESTIMONY OF DOROTHY SIMMONS**

The DOTD argues that the trial court erred in refusing to allow it to call Dorothy Simmons. Ms. Simmons is the mother of Brandon and Randon. The DOTD sought to include her testimony to establish that she and Mr. Raymond were still in a relationship at the time of his death. The trial court did not allow the DOTD to call Ms. Simmons as a witness because she was not called out as a witness prior to trial and not put under the rule of sequestration found in La.Code Evid. art. 615. A trial court has broad discretion in determining whether a witness who is not placed under

4

a sequestration order may testify. *State v. Simien*, 95-1407 (La.App. 3 Cir. 7/24/96), 677 So.2d 1138.

The DOTD argues that she was listed as a witness by the Plaintiffs, and it listed any witness called by any other party. However, prior to opening statements, the parties listed their witnesses to be placed under the rule, and Ms. Simmons was not listed by either party. At this point, the DOTD should have realized that the Plaintiffs were not planning on calling Ms. Simmons to testify and listed her as one of its own witnesses so she could be included in the sequestration order. Furthermore, the DOTD did question both Brandon and Randon about their mother's relationship with their father at trial. We cannot say that the trial court abused its broad discretion in excluding the testimony of Ms. Simmons.

### NOTICE REQUIREMENT OF LA.R.S. 9:2800

The Plaintiffs' main contention at trial was that the area where Mr. Raymond was killed was defective for the failure to include a no-passing zone pennant sign. The DOTD argues that the trial court erred in refusing to require the Plaintiffs to prove notice of a defect as required by La.R.S. 9:2800 and in failing to instruct the jury of such requirement. The Plaintiffs argue that they were not required to prove notice because the DOTD created the dangerous condition and is charged with knowledge of that condition.

Traditionally, the DOTD could be held liable for damages based on negligence under La.Civ.Code art. 2315 or strict liability under La.Civ.Code art. 2317. *Lee v. State through Dept. of Transp. and Dev.*, 97-350 (La. 10/21/97), 701 So.2d 676. Louisiana Civil Code Article 9:2800 eliminated the distinction between the two theories by requiring proof of actual or constructive notice of the defect which causes damage. *Id*. Now, the plaintiff must establish that (1) the thing which caused the

damage was in the custody of the DOTD; (2) the thing was defective because it had a condition which created an unreasonable risk of harm; (3) the DOTD had actual or constructive notice of the defect and failed to take corrective measures within a reasonable time; and (4) the defect was a cause-in-fact of the plaintiff's injuries. *Id.*

In *Facheaux v. Terrbonne Consol. Gov't*, 615 So.2d 289, 293 (La.1993), the supreme court, in analogizing a public body's duty regarding a gate on a canal, discussed the element of knowledge as follows:

> The court of appeal erroneously determined, however, that the parish had no duty to provide warnings in this instance because it was not proved that the parish had knowledge of any danger presented by the gate and its manner of operation. Cited as authority were cases where defects developed after construction of the facility, such as where a sign had been removed or where a defect developed over a period of time. These cases and their requirement of knowledge are not applicable where the need to provide warnings arises from a danger inherent in the design and construction of the facility. A public body charged with maintaining a public route cannot claim lack of knowledge of the need to provide warnings where the danger is obvious and inherent in the design and construction of the facility. A public body is held to know of the danger of an unmarked intersection, or a sharp curve, or a draw bridge, or, as in this case, a gate that raises and lowers automatically so as to block a canal used by boat operators. Likewise, the public authority must provide adequate warnings of unusual obstructions or perilous conditions so as to make the route reasonably safe for those traveling on it.

In *Whatley v. City of Winnfield*, 35,132 (La.App. 2 Cir. 12/5/01), 802 So.2d 983, *writ denied*, 02-510 (La. 3/22/02), 811 So.2d 939, the second circuit recognized that the requirement of notice to a public body is inapplicable to a case where the dangerous condition was attributable to the public body or its employees. Notice is only required when the defective condition is not caused by the public body's own act or negligence.

In *Johnson v. State ex rel. DOTD*, 06-898 (La.App. 3 Cir. 12/13/06), 946 So.2d 682, *writ denied*, 07-510 (La. 4/27/07), 955 So.2d 693, this court followed the reasoning of *Whatley* and found that the DOTD was not entitled to notice of defective

6

signage that it created. A stop sign at an intersection in a construction zone had been obscured from view by detour signs.

Furthermore, in *Rogers v. State ex rel. DOTD*, 02-809 (La.App. 3 Cir. 2/5/03), 838 So.2d 849, *writ denied*, 03-668 (La. 5/2/03), 842 So.2d 1107, this court held that the DOTD had actual knowledge of the dangerous condition created by changing a fixed light to a flashing red light at the intersection. We found that the DOTD was aware of the special dangers that the intersection presented due to the skewed angle design and the high speeds of those traveling in the area.

As the DOTD has argued, both at the trial court level and to this court, the decision of whether to place a no-passing zone pennant sign was at the discretion of its engineers. There is no need to prove notice when the DOTD makes the decision not to use a particular sign.

## FAULT

The jury assessed the DOTD with twenty-five percent of the fault and Mr. Taylor with the remaining seventy-five percent of the fault. The DOTD argues that the jury erred in not placing the entire responsibility of this accident on Mr. Taylor. The Plaintiffs answered the appeal and asked that we increase the fault of the DOTD to not less than fifty percent.

We are limited to a manifest error standard of review in reviewing the factual findings of a jury. *Fontenot v. Patterson*, 09-669 (La. 10/20/09), 23 So.3d 259. This means that an appellate court may not disturb a jury's finding of fact unless the record establishes that a factual, reasonable basis does not exist. *Id*. In reviewing the record in its entirety to determine whether the factual findings were clearly wrong, the appellate court must determine not whether the jury was right or wrong but whether its conclusion was reasonable. *Id*.

7

Under Louisiana's comparative negligence scheme in La.Civ.Code art. 2323, more than one party may be at fault for the damages sustained in a vehicular accident, so a duty-risk analysis is used to determine liability. *Fontenot*, 23 So.3d 259. Under a duty-risk analysis, a plaintiff must prove that (1) the conduct in question was the cause-in-fact of the resulting harm; (2) the defendant owed a duty to the plaintiff, which the defendant breached; and (3) the risk of harm was within the scope of protection afforded by the duty breached. *Id*.

Strict liability tort claims against the DOTD are pursued under La.Civ.Code art 2317 and La.R.S. 9:2800 while negligence claims are pursued under La.Civ.Code art. 2315. *Fontenot*, 23 So.3d 259. The legal analysis under both theories is the same, with plaintiff bearing the burden of establishing that:

> (1) the DOTD had custody of the thing that caused the plaintiff's injuries or damages; (2) the thing was defective because it had a condition that created an unreasonable risk of harm; (3) the DOTD had actual or constructive knowledge of the defect and did not take corrective measures within a reasonable time; and (4) the defect in the thing was a cause-in-fact of the plaintiff's injuries.

*Id*. 267-68.

Utilizing these principles, we will determine whether the jury was clearly wrong in assessing the DOTD with any fault.

In his deposition, Mr. Taylor indicated that on the day of the accident, he was headed to New Orleans to get a sea card so he could work on tugboats. He had stayed at his mother's house in Shreveport the night before. Mr. Taylor used his mother's truck to drive to New Orleans. Mr. Taylor realized that he needed his birth certificate to get the sea card. He was living with his girlfriend at her mother's house in Leesville, so he had to stop in Leesville on the way to New Orleans to get his birth certificate. He was also going to drop off his dog.

At the time of the accident, it was raining. Mr. Taylor was traveling south on Highway 117 on a very long downhill slope. Highway 117 is a two-lane highway. Mr. Taylor decided to pass a loaded log truck. According to Mr. Taylor, he made it about three quarters of the way up the side of the log truck to the cab when he saw the headlights of Mr. Raymond's vehicle, which was heading north as it was coming out of a curve. Mr. Raymond went to the shoulder of the road to avoid the accident. At the same time, Mr. Taylor also went to the shoulder of the road where the two vehicles had a head-on collision.

Trooper Heather Owens was called to investigate the accident on October 25, 2002, at 7:40 a.m. During the course of her investigation, Trooper Owens noted that there were 668 feet of stripes indicating a no-passing zone prior to the crash site. Mr. Taylor told her he was in a passing zone when he began passing the log truck. She observed the absence of a no-passing sign even though there were markings on the road indicating a no-passing zone where the accident occurred. She notified the DOTD about the absence of the sign and was advised that the signs were not mandatory due to the classification of the road.

Trooper Owens interviewed Mr. Taylor, who told her that he needed his birth certificate to get a sea card so he was traveling out of his way to Leesville to get it. Mr. Taylor stated, he was traveling fifty to fifty-five miles per hour. He did not have his driver's license, and it was later determined that it had been suspended. Mr. Taylor was later charged with negligent homicide as a result of the accident.

Duaine Evans, a consulting traffic engineer and accident reconstructionist, testified on behalf of the Plaintiffs. He opined that there should have been a no-passing sign on the left shoulder indicating the beginning of the no-passing zone. He stated that a no-passing sign has a much greater impact and is easier to see than

9

stripes on the road. Mr. Evans testified that when you have rainy conditions, such as in this case, the line on the road is more difficult to see. Mr. Evans also testified about several studies involving the use of no-passing signs.

A study in 1979 by the Texas Transportation Institute at Texas A&M indicated that the need for advance warning of a no-passing zone was evidenced by the rapidly spreading adoption of the no-passing zone pennant sign. The study also looked at clipping, which is a situation that involves a person starting out in a passing zone and ending up in a no-passing zone. The study indicated that fifty-one percent of the people would see the no-passing zone pennant sign and get back in their lane.

In 1992, a study of two-lane rural roads by the Federal Highway Administration recommended the use of no-passing signs to further demarcate a passing zone from a no-passing zone, especially where existing pavement markings are obscured. A 1998 study by the U.S. Transportation Department, Federal Highway Administration, recommended that even larger no-passing signs be used.

According to Mr. Evans, the Louisiana State Legislature adopted the Manual of Uniform Traffic Control Devices (MUTCD), which provides guidance for the striping and signing of highways. In 1988, the MUTCD mandated the use of a no-passing sign in areas of critical passing maneuvers. However, in 2000, the MUTCD removed the mandatory requirement of a no-passing sign and now only indicates the shape and position of the sign "when used." Mr. Evans agreed that the manual leaves room for engineering judgment in the application of the signs and pavement markings.

Mr. Evans testified that factors like the weather and the log truck in front of Mr. Taylor created problems in seeing the no-passing stripes on the road. Mr. Taylor would have seen a no-passing sign from a farther distance, and it would have been in

10

his view the entire time.

Mr. Evans also evaluated the striping of Highway 117 at the accident site. Mr. Evans testified that if you are traveling fifty-five miles per hour, you should be able to see 900 feet away according to the MUTCD in order to start a passing maneuver. When the no-passing zone prior to the passing zone in which Mr. Taylor began his maneuver ends, a person could only see 783.5 feet up the road, so there was inadequate sight distance. Also, if the area had been properly striped, the distance between the no-passing zone for which Mr. Taylor was exiting and the no-passing zone which he entered immediately prior to the accident would have been reduced to 874 feet. According to the DOTD Engineering Directives and Standards, 800 feet is required between no-passing zones or the zones must be connected.

Mr. Evans testified that the location of the accident was unreasonably dangerous due to the absence of a no-passing sign. He opined that the accident more than likely would not have happened if the sign had been in place. He explained that this is a critical passing area because the two no-passing zones are so close together as to almost require that there be a continuous no-passing zone. There is very little room for a driver to make a mistake.

Dean Tekell, a traffic engineer, testified on behalf of the DOTD. Mr. Tekell, who serves on the National Committee on Uniform Traffic Control Devices, testified that the 2000 MUTCD removed the mandatory language, because while it is still a good sign, it is not necessarily needed everywhere. Mr. Tekell stated that the absence of a no-passing sign did not make this road unsafe. However, Mr. Tekell also testified a that no-passing sign is designed to reduce the probability that this type of crash will occur and admitted that the sign would make the roadway safer. He also agreed that he would like to see the sign out there.

Mr. Tekell stated that Mr. Taylor was near the end of the passing zone before he began his passing maneuver. Mr. Tekell testified that at the time Mr. Taylor attempted the passing maneuver, he could see the pavement markings, and he could see down the road past the crash site. He also opined that Mr. Taylor should have realized that he was in a no-passing zone about sixty-three to sixty-six feet from it and should have aborted the passing maneuver.

Based on the evidence, we find no manifest error in the jury's conclusion that the DOTD was twenty-five percent at fault for this accident and that Mr. Taylor was seventy-five percent at fault. The jury heard from both experts that a no-passing sign in the area of the accident would have made the road safer. This is especially true since Mr. Evans testified that the area was a critical passing area with little room for mistake. The jury even heard Trooper Owens testify that any additional sign would have been great. Clearly, the jury believed Mr. Taylor had the most responsibility for this accident. He attempted to pass a log truck in rainy weather because he was in a hurry to get his birth certificate and get back on the road to New Orleans. He did not start his passing maneuver until the end of the no-passing zone. The jury could have also believed that Mr. Taylor had time to abort the passing maneuver.

**DAMAGES**

The DOTD complains that the award of damages by the jury was excessive. It complains that wrongful death damages awards to the wife of $1,500,000.00 and $750,000.00 to each of the four children were overborne by the jury's sympathy for the family members. It further claims that Mr. Raymond did not have time to experience pre-death fear so the $50,000.00 award for survival damages was not warranted. DOTD also complains about the award of lost earnings damages.

12

The supreme court recently reiterated the principles of appellate review of damages in *Guillory v. Lee*, 09-75, pp. 14-16 (La. 6/26/09), 16 So.3d 1104, 1116-1118:

> It is well-settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages. Louisiana Civil Code article 2324.1 provides: "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. *Wainwright v. Fontenot*, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. This court has noted:
>
> > [T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
>
> *Perkins v. Entergy Corp.*, 00-1372 (La.3/23/01), 782 So.2d 606, *reh'g denied*, 4/27/01 (quoting *Canter v. Koehring*, 283 So.2d 716, 724 (La.1973)) (*superseded by statute on other grounds* ). Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review. *Youn v. Maritime Overseas Corp., et al.*, 623 So.2d 1257, 1261 (La.1993), *reh'g denied*, 10/7/93.
>
> The role of an appellate court in reviewing a general damages award, one which may not be fixed with pecuniary exactitude, is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. This court has long held true to the following principle:
>
> > [b]efore a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is

> reasonably within the discretion afforded that court.

*Wainwright*, 00-0492, p. 6, 774 So.2d at 74 (quoting *Coco v. Winston Indus., Inc.*, 341 So.2d 332, 334 (La.1977) (internal citations omitted)). *See also Miller v. LAMMICO*, 07-1352, p. 28 (La.1/16/08), 973 So.2d 693, 711 (stating that an appellate court may disturb a damages award only after an articulated analysis of the facts discloses an abuse of discretion and citing *Theriot v. Allstate Ins. Co.*, 625 So.2d 1337, 1340 (La.1993)); *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La.1993); *Reck v. Stevens*, 373 So.2d 498, 501 (La.1979). Furthermore, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Id*. (citing *Arceneaux v. Domingue*, 365 So. 2d 1330, 1333 (La.1978) and *Watson v. State Farm Fire & Casualty Ins. Co.*, 469 So.2d 967 (La.1985)). Moreover, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. *Perkins*, 782 So.2d at 612 (citing *Ambrose v. New Orleans Police Department Ambulance Service*, 93-3099, 93-3110, 93-3112, p. 8 (La.7/5/94), 639 So.2d 216, 221). Reasonable persons frequently disagree about the measure of damages in a particular case. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Youn*, 623 So.2d at 1261.

Special damages are those which have a "ready market value," such that the amount of damages theoretically may be determined with relative certainty, including medical expenses and lost wages. *Kaiser v. Hardin*, 06-2092, p. 11 (La.4/11/07), 953 So.2d 802, 810 (per curiam) (citing *McGee v. AC and S, Inc.*, 05-1036 (La.7/10/06), 933 So.2d 770). An appellate court, in reviewing a jury's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong. *Kaiser*, 06-2092 at p. 11-12, 953 So.2d at 810 (citing *Guillory v. Ins. Co. of North America*, 96-1084 (La.4/8/97), 692 So.2d 1029).

**General Damages**

<u>Wrongful Death Damages</u>

The elements to consider in making an award of wrongful death damages include loss of love and affection, loss of services, loss of support, medical expenses,

and funeral expenses. *Smith v. Municipality of Ferriday*, 05-755 (La.App. 3 Cir. 2/1/06), 922 So.2d 1222, *writ denied*, 06-934 (La. 9/29/06), 937 So.2d 860. A separate award was made for funeral damages, which is not at issue in this appeal, so that will not be part of our analysis.

Mrs. Raymond testified at trial that she and Mr. Raymond had dated for two years before they were married on August 21, 1989. They had just finished construction of a new home in January 2002, ten months before Mr. Raymond was killed.

Their first child, Lauren, was born on May 31, 1991. On January 14, 1998, they had a son, Kayleon. His twin sons from a previous relationship, Brandon and Randon, had just turned sixteen on October 19, before their father was killed. Mrs. Raymond testified that her husband loved all of his children. He would often bring the twins to play with her children and participate in other family activities.

The children talked about how their father liked to play basketball with them, and he would often take them shopping. He did a lot of cooking for the children. All the children missed their father and the fact they would not be able to talk to him about things going on in their lives.

After the accident, Lauren and Kayleon began sleeping with their mother and still were at the time of trial. They have not moved his clothes, even clothes he left folded on the side of the tub. Kayleon feels like a huge part of his life is missing, and Lauren does not look forward to getting married because her father will not be there to walk her down the aisle.

Mrs. Raymond explained that the magnitude of the loss of her husband has been far greater than she could ever explain. She explained that they still live through it each day. Mrs. Raymond acknowledged that she suspected early in the marriage

15

that her husband was seeing someone else, so she filed for divorce. However, she never sensed that Mr. Raymond did not love her. They obviously got past their issues as they had been married for thirteen years at the time of Mr. Raymond's death.

We find no abuse of discretion in the award of wrongful death damages to Mrs. Raymond. While the award may be on the high side, we cannot say the jury abused its much discretion. Mr. Raymond's death has effected Mrs. Raymond profoundly and continues to do so. She now is now faced with a future of raising her two young children by herself as their sole surviving parent.

It has been recognized that the loss of a parent to a child is very traumatic. Children face a future of great life events that will not include this parent in addition to the lose of affection, care, assistance, advice, and companionship of the parent. *See Brossett v. Howard*, 08-535 (La.App. 3 Cir. 12/10/08), 998 So.2d 916, *writ denied*, 09-77 (La. 3/6/09), 3 So.3d 492; *McGrail v. Lee*, 35,756 (La.App. 2 Cir. 4/3/02), 814 So.2d 729, *writ granted*, 02-1496 (La. 10/4/02), 826 So.2d 1110, *writ denied as improvidently granted*, 02-1496 (La. 4/9/03), 874 So.2d 66. We cannot say that the jury's award of $750,000.00 to each child was an abuse of discretion.

Survival Damages

Survival damages are damages awarded for the pre-death mental and physical pain and suffering of the deceased. *Leary v. State Farm Mut. Auto. Ins. Co.*, 07-1184 (La.App. 3 Cir. 3/5/08), 978 So.2d 1094, *writ denied*, 08-727 (La. 5/30/08), 983 So.2d 900. An award of survival damages is appropriate if there is even a scintilla of evidence of the fright, fear, or mental anguish during the ordeal leading to the death and of pain and suffering on the part of the decedent. *Id.*

Obviously, Mr. Raymond feared that he was about to be involved in a head-on collision as he moved over to the shoulder in an attempt to avoid the accident. Mr.

16

Taylor testified that he when he checked on Mr. Raymond, he grunted. Mr. Raymond also raised his head up two or three times, and his eyes were halfway open.

Mr. Raymond was transported to the Natchitoches Parish Hospital. It was observed that he suffered severe chest and abdomen trauma. A chest x-ray revealed multiple rib fractures on the left. Pulmonary contusions were also observed.

We find no abuse of discretion in the award of $50,000.00 for the pre-impact fear and suffering Mr. Raymond endured as a result of this accident.

**Special Damages**

Loss of Earnings

Awards for loss of earnings includes loss of support from the date of death to the date of trial and loss of future earnings from the date of trial through the length of the decedent's work-life expectancy. *Brossett v. Howard*, 998 So.2d 916.

> Awards for future lost income are inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty, thus the courts must exercise sound judicial discretion to determine these awards. The awards should be consistent with the record and not work a hardship upon either party. Factors to be considered in determining a proper award for lost future income are the decedent's physical condition before his death, the decedent's past work history and consistency thereof, the amount the decedent probably would have earned absent the death, and the probability that the decedent would have continued to earn wages over the remainder of his working life.

*Id*. at 932 (*quoting Magee v. Pittman*, 98-1164, p. 22 (La.App. 1 Cir. 5/12/00), 761 So.2d 731, 748-49, *writ denied*, 00-1694 (La. 9/22/00), 768 So.2d 31).

The jury made an award of $1,514,747.79 for loss of earnings. While not disputing the portion of the award representing the loss of earnings Mr. Raymond would have earned as a firefighter, the DOTD argues that the award of damages to Mr. Raymond erroneously assumed that he would work past retirement even though he was diabetic and morbidly obese.

17

Dr. Terry Bechtel, an expert in the field of accounting, testified as to the loss of earnings due to Mr. Raymond's death. Of the total award, $1,118,533.33 was for future losses. As a firefighter at Fort Polk, Dr. Bechtel knew that Mr. Raymond would be required to retire at age fifty-seven. However, he assumed he would continue to work until the full retirement age of sixty-six in Natchitoches earning an average wage rate. He also included a cost-of-living adjustment to the fireman's pension he would receive once he retired.

Dr. Bechtel also assumed that Mr. Raymond would die naturally. The average life expectancy in 2002 was seventy-four and seven-tenths years. Mrs. Raymond testified that her husband suffered with hypertension and diabetes and was taking insulin. However, there is no evidence in the record to suggest how these health issues would effect Mr. Raymond's life expectancy. We find no abuse of discretion in the jury's award for loss of earnings.

## EXPERT WITNESS FEES AND EXHIBIT COSTS

In its final assignment of error, the DOTD complains about the trial court's award of expert witness fees. Additionally, it claims the trial court erred in awarding the Plaintiffs the costs to enlarge its exhibits and the entire cost of the survey.

Following trial, the trial court entered an order fixing and taxing costs. Expert witness fees were awarded to Duaine Evans in the amount of $9,281.10 and to Dr. Terry Bechtel in the amount of $3,564.35. An award of $3,057.50 was granted for the survey of the area where the accident occurred in addition to an award of $1,075.00 for the visual presentations.

Generally, costs are paid by the party cast in judgment. La.Code Civ.P.art. 1920. Pursuant to La.R.S. 13:3666, expert witnesses are entitled to be compensated for their services in an amount to be determined by the court which are taxed as costs

18

to be paid by the party cast in judgment. Pursuant to La.R.S. 13:4533, the trial court may award other general costs of litigation. The determination of expert witness fees and the reasonableness of costs incurred by the prevailing party is within the sound discretion of the trial court which an appellate court may not overturn absent an abuse of discretion. *Corkern v. Smith*, 06-1569 (La.App. 3 Cir. 6/6/07), 960 So.2d 1152, *writ denied*. 07-1803 (La. 1/25/08), 973 So.2d 754. "In fixing expert witness fees, each case must turn on its own peculiar facts and circumstances." *Massie v. Deloach*, 04-1425, p. 10 (La.App. 3 Cir. 3/2/05), 896 So.2d 1246, 1252, *writ denied*, 05-786 (La. 5/6/05), 901 So.2d 1107. Factors to be considered include (1) the amount of time spent preparing for trial; (2) the time actually spent in court; (3) the extent and nature of the work performed; (4) the knowledge, attainments, and skill of the expert; (5) awards to experts in similar cases; (6) the complexity of the problem addressed by the court; and (7) the helpfulness of the expert's report and testimony to the trial court. *Id*.

Invoices were introduced by the Plaintiffs supporting the costs. Both of Plaintiffs' experts not only did hours of work preparing for trial but also testified in person at trial. Both Mr. Evans and Mr. Tekell used the survey in their testimonies at trial. The exhibits were also used by the Plaintiffs at trial to present their case to the jury. We cannot say the trial court abused its discretion in the assessment of expert witness fees and costs.

For the foregoing reasons, the judgment of the trial court is affirmed. Court costs in the total amount of $11,095.12 are assessed to the Louisiana State Department of Transportation and Development.

**AFFIRMED**.

19