STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

**11-68**

STATE OF LOUISIANA

VERSUS

DRAYMOND PAUL COMPTON

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
PARISH OF LAFAYETTE, NO. CR114695, DIV. K
HONORABLE PATRICK L. MICHOT, DISTRICT JUDGE

**********

**J. DAVID PAINTER**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, J. David Painter, and James T. Genovese, Judges.

**CONVICTIONS AFFIRMED,
SENTENCES AMENDED WITH INSTRUCTIONS.**


**Michael Harson, District Attorney**
**Mark T. Garber, Assistant District Attorney**
**Fifteenth Judicial District**
**P.O. Box 3306**
**Lafayette, LA 70502**
**Counsel for Appellee:**
    **State of Louisiana**

**Annette F. Roach, Attorney at Law**
**Louisiana Appellate Project**
**P.O. Box 1747**
**Lake Charles, LA 70602-1747**
**Counsel for Defendant/Appellant:**
    **Draymond Paul Compton**

**PAINTER, Judge.**

Defendant, Draymond Paul Compton, appeals his convictions and sentences on two counts of battery of a police officer requiring medical attention. For the following reasons, we affirm his convictions, amend his sentences to delete the provisions that they be served without the benefit of parole, probation, or suspension of sentence, and instruct the trial court to note said amendment in the court minutes.

## PROCEDURAL BACKGROUND

Defendant was tried on four counts of battery of a police officer that required medical attention and one count of attempted disarming of a police officer, stemming from an incident occurring on December 30, 2006. A jury convicted him of two counts of battery of a police officer that required medical attention (for Corporal Jason Airhart and Officer William White) and acquitted him of the remaining charges. For each conviction of battery of a police officer requiring medical attention, Defendant was sentenced to two years at hard labor without benefit of parole, probation, or suspension of sentence and ordered to pay a fine of $1000.00. The sentences were ordered to run consecutively. Defendant is now before this court appealing his convictions and sentences. On appeal, Defendant raises the following assignments of error: (1) the evidence was insufficient to prove all of the elements of the offense of felony-grade battery of a police officer and was insufficient to negate his claims that his actions were necessary to protect himself against excessive force; (2) the trial court erred in denying his motion for a mistrial on the grounds that the alternate juror was present during deliberations; and (3) the sentences imposed were both illegal and excessive.

## DISCUSSION

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is an error patent regarding the provision that the sentences be served without benefit of parole, probation, or suspension of sentence. Defense counsel points out that the

penalty in effect at the time of the commission of the offense, December 30, 2006, did not provide that the sentence was to be served without benefit of parole, probation, or suspension of sentence and that the requirement that at least thirty days of the sentence be served without benefits did not become effective until months after the crimes occurred.

At the time of the commission of the offense, La.R.S. 14:34.2(B)(3) required imposition of a fine of not more than one thousand dollars or imprisonment with or without hard labor for not less than one year nor more than five years, or both. After the amendment in 2007, the statute required "[a]t least thirty days of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence." Therefore, we find that corrective action is necessary and amend the sentences to delete the provisions denying eligibility for parole, probation, or suspension of sentence. *State v. Levy*, 08-1467 (La.App. 3 Cir. 6/10/09), 12 So.3d 1135, and *State v. Dupree*, 07-98 (La.App. 3 Cir. 5/30/07), 957 So.2d 966. The trial court is hereby ordered to note the amendments in the court minutes.

## *Sufficiency of the Evidence*

Defendant alleges that the evidence presented by the State was insufficient to prove all of the elements of each offense. Specifically, Defendant claims that the State failed to prove that he was not justified in defending himself against the officers' unnecessary and excessive force and that it failed to prove an intentional use of force by Defendant. Defendant further asserts that the injuries suffered by the police officers did not *require* medical attention.

Battery of a police officer is defined in La.R.S. 14:34.2(A)(1) as "a battery committed without the consent of the victim when the offender has reasonable grounds to believe the victim is a police officer acting in the performance of his duty."

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven

2

beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the Jackson standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

*State v. Clark*, 10-559, p. 3 (La.App. 3 Cir. 12/8/10), 52 So.3d 304, 306.

Corporal Jason Airhart, a police officer with the Lafayette City Police Department, testified that on December 30, 2006, he was dispatched to 220 Westpoint Drive, Unit 406, regarding a domestic disturbance in which Defendant was alleged to be holding his girlfriend or wife against her will. Dispatched with Airhart were Sergeant Kevin Moore, Corporal Jared Hartwell, and Officer Brock Richard. Upon arriving at the scene, the officers learned from the woman's mother that there was a protective order in effect in favor of her daughter, Rhiannon Cantrelle, against Defendant. Officers confirmed the existence of the order. The protective order also included Cantrelle's two children.

Upon arriving at the scene, Airhart, Hartwell, and Moore approached the front door, and Richard went to the back of the home. As officers approached the front door, they observed someone peeking out through an upstairs mini blind. The officers knocked on the front door, and after several minutes, Cantrelle answered the door. Her face was red, and she was crying. The officers entered the home, and Cantrelle told the officers that "they" were upstairs. The officers encountered a visibly upset young girl at the top of the stairwell; they passed her down the staircase to get her out of the house. As officers turned and continued up the stairs, they encountered Defendant and a little boy who was two to three years old. The officers

gave Defendant loud verbal commands to get down on the ground and to let them see his hands; they told him that he was under arrest. Defendant initially complied and went "all the way down to almost a prone position." Airhart explained that they had Defendant get on his stomach as opposed to putting his hands behind his back because of his delay in answering the door and the description of violence given by Cantrelle's mother. When Defendant got to his stomach, Airhart and Officer Shannon Brasseaux, another officer who had arrived on the scene, attempted to handcuff him. As they were leaning on him, he "basically did a push-up" and got up. Airhart testified that they were not able to get him back to the ground and that he started swinging with a closed fist. The officers continually commanded him to stop resisting, telling him that he was under arrest. Airhart testified that he was able to duck a punch, and he then slid behind Defendant and went to put him in a choke hold. As he did this, Defendant turned and tried to bite Airhart on his biceps. As Airhart felt the pressure on his arm, he was able to move his arm away from Defendant's mouth. Defendant continued to fight, kick, and punch, while Airhart attempted to lock Defendant with his other arm and take him back down to the ground. Airhart explained that the safest way to handcuff a suspect is to get him on the ground where they can get control of him, but they were unsuccessful in getting Defendant to the ground.

While they were unsuccessfully attempting to get Defendant's arm locked behind him, Hartwell attempted to employ a taser, because, as Airhart explained, Defendant was resisting the physical contact, and arm bars and a choke hold were not working. Defendant did not react when the taser was deployed, and the fight continued. According to Airhart, Defendant continued to throw punches, and Defendant "landed a punch on another officer who had arrived to help, Officer White." Although Airhart felt that it would have been within his "use of force policy" to use a baton at this point, he did not do so because he did not want to let go of Defendant or to take a step away to grab his baton. According to Airhart, at this point, he, Brasseaux, and White all had their hands on Defendant. When asked how

4

Defendant was able to continue swinging his first with three officers trying to gain control of him, Airhart explained that Defendant, a strong "big guy," was in a rage. Hartwell and Overby were able to get the little boy and take him downstairs.

At this point, Defendant "kind of backed away," and Airhart saw that Defendant had an asp or baton in his hand. Airhart explained that an asp is the metal expandable baton which they carry on their belts and is used to strike certain areas of the body, or "green zones," to gain compliance. According to Airhart, a "green zone" is an area of the body where strikes are permissible because they will not cause major injury. In training, officers are instructed that if a subject gains control of something such as a metal pipe or baton, deadly force could be authorized.[1]

Upon obtaining the baton, Defendant raised it in the air like he was going to strike someone and started backing up toward the bedroom.[2] Airhart could not recall if the baton was fully expanded, but he testified that it was "definitely not just the handle." Some officers had drawn their weapons, and everyone was screaming at Defendant to drop the baton. Defendant backed into the bedroom and shut the door. Officers gave Defendant verbal commands to come out of the room, but Defendant moved furniture against the door to barricade himself in. Officers kicked the door and gained entry into the room.[3] At that point, Defendant ran toward the bedroom window and was going to jump out of the bottom glass portion, which he had broken, but he was too large to get through the opening. When officers again attempted to gain physical control of Defendant, he started fighting again with his fists, pushing, and kicking. Airhart testified that they were simply trying to gain control of Defendant and that, if he had complied with their verbal commands, they would have just handcuffed him and brought him downstairs.

---

[1]Airhart testified that the "meaty part" of the thigh is a green zone, but the head is a red zone because a hit there with the baton can kill someone. Airhart explained that if the baton is in the hands of an untrained person who does not know where to strike, a hit could be lethal.

[2]On cross-examination, Airhart testified that Defendant raised the baton like he wanted to hit someone, but he never swung it at anyone.

[3]Airhart testified that he did not know the reason for Defendant entering the bedroom. He affirmed that the concern for his own safety as well as the safety of his fellow officers prevented him from just backing away.

5

At some point during the fight in the bedroom, officers were able to get Defendant down on the ground, but he was kicking and trying to get up. Airhart testified that he heard White screaming, "[H]e's biting me." Airhart pushed White onto the bed, and White was able to get his leg out of Defendant's mouth. As Airhart was pushing White, he felt Defendant biting the calf of his right leg. After putting Defendant in an arm bar and applying pressure, Airhart was eventually successful in getting Defendant to release his leg. Airhart then passed Defendant's arm over to another officer who was able to handcuff it. Officers got Defendant under control soon thereafter. Airhart testified that in addition to the bite wound, his hands were swollen and that he sustained cuts and bruises.

Airhart testified that he sought medical attention at Our Lady of Lourdes Hospital for his hands because they were swollen and hard to close, and he wanted to make sure that he had no broken bones. He testified that he also sought medical attention for the bite wound due to the possibility of transmission of diseases. According to Airhart, the treating physician gave him a prescription for an antibiotic cream for the bite wound. The doctor's report stated, "On the calf is a wound that was a result of a bite, but in actuality, is just a bruise with a faint peel of skin. There is no puncture." The radiology report indicated that there was a "non-displaced fracture of the base of the distal phalangeal of the right fifth finger. There is soft tissue swelling in this area. No other bone or joint abnormalities are noted." The medical report showed that there was blunt injury to the finger with no obvious fracture. Airhart testified that he recovered from the hand problems within a couple of days, but the bite took longer to heal because it got infected. The bite left a slight circular scar with some numbness in that area. Pictures of the bite were taken a few days after the incident and were introduced at trial as State's Exhibits #2 and #3.

Airhart was questioned about the taser on cross-examination. Airhart explained that a taser is an electronic muscle disruption device; it interrupts the signals that the brain and nervous system send to the muscles. He also stated that, in training, they were not advised as to how many times they should or should not taser

6

someone. Airhart testified that he had heard of someone in Lafayette dying after being tased. On redirect examination, Airhart affirmed that he was unaware of anyone having died as a direct result of being tased but that he had heard of people dying "for various reasons" after being tased. He testified that he was taught in training that the taser is not a deadly force weapon. He explained that the taser reports downloaded from the taser only indicate whether a discharge occurred; they do not indicate whether contact was made.

Corporal Jared Hartwell of the Lafayette Police Department was also one of the responding officers. Hartwell testified that he knew it was a violent situation possibly involving weapons and that all of the officers were wearing uniforms. For the most part, Hartwell's testimony regarding the initial contact with Defendant was the same as Airhart's. However, much of Hartwell's testimony focused on his deployment and knowledge of the taser. Hartwell indicated to Airhart that he was going to deploy the taser for his safety. Hartwell testified that the taser is an intermediate weapon or tool that is "to be used to stop any aggression toward an officer, toward a suspect, toward anybody else that may be in the house. The goal of the taser is to be able to incapacitate the suspect, take him into custody without any further use of force, meaning [officers] don't have to hit him with the baton, pepper spray[,] or things of that nature." The taser is designed to cause less harm than an impact weapon. Hartwell testified that with Defendant's level of resistance, if they had not used the taser, they could have used an impact weapon such as a baton, a night stick, or things of that nature. Before using the taser, Hartwell yelled out, "taser." He deployed the taser at the center of Defendant's torso from approximately seven to ten feet away, which, Hartwell explained, is a little too close to get maximum effectiveness of the taser. Hartwell testified that the taser should be deployed at thirteen feet for maximum effectiveness. Defendant leaned forward and then fell backwards. The taser was ineffective, and Defendant started fighting again.[4]

---

[4]Hartwell testified that the taser seemed to stun Defendant momentarily.

Hartwell testified that he has been tasered and that it made every muscle in his body "lock up," and he fell straight on the mat in front of him; this is what he expected to happen to Defendant. Additionally, every other time he's deployed a taser, the person became incapacitated, and officers were able to take the person into custody without having to use any force.

He explained:

[T]he taser is designed to mimic or interfere with your central nervous system's ability to communicate with the muscles in your body. It has a co-sign or a wave - - or, I mean, some scientific explanation that it mimicked to make every muscle in your body go rigid so that any resistance will stop. And in order for that effect to occur, you need the greatest spread of distance between the probes so that the signal is transferred to your body in such a way that it incapacitates it.

On cross-examination, Hartwell explained that a taser can be used in two ways. First, the two metal contacts on the end of the taser can be pushed into someone, and when the trigger is pulled, it causes pain. Or, a small cartridge can be clipped into the end of the taser; when the trigger is pulled, the cartridge is fired and the two probes "fly out with the little wires trailing that connect the probes to the taser device." Hartwell testified that he re-holstered the taser with the cartridge on it; the only way it could be used again was in the "drive[-]stun mode" where it is pushed into someone.

Hartwell further explained that after an initial shock, he was only allowed to use the taser in drive-stun mode for "pain compliance" and that the taser's log would register each such use. He further testified that:

if the spread of the probes is not wide enough to give you the locking of the muscles . . . causing somebody to freeze or seize up, what we're instructed to do is take that -- the taser itself, the probes stay where they are, and go to some place else on the body wider than where we think that the probes went and apply it. So basic principles of electricity is now, instead of two (2) contacts with the probes, we have three (3); the two (2) from the probes and a third one wherever else on the body it's applied. That third application or that drive stun with the cartridge still on and the probes still in, the hopes are that it gives you the spread that you need for the electricity to complete the circuit to give you the capabilities of the taser that we want, the disruption where the person locked up where he can be brought into custody.

Hartwell re-holstered the taser and assisted Airhart in trying to handcuff Defendant. Hartwell was pushed backwards down the steps to the first landing. As he got up, Officer Raymond Overby handed him a two- to three-year-old little boy who had been retrieved from a nearby bedroom. As Overby was carrying the child with his arms extended, Hartwell saw Defendant attempt to grab Overby's weapon. Defendant was successful in grabbing Overby's baton.

Hartwell took the child to an officer outside the home, and he then ran back upstairs to assist the other officers. Once officers gained entry into the bedroom, Hartwell saw the police dog attack Defendant in an effort to apprehend him. Hartwell also testified that he struck Defendant in the lower leg with an impact weapon (a flashlight) multiple times until his aggression stopped and he could be handcuffed. Hartwell testified that he has been a police officer for fourteen years and that this was the worst fight he had been involved in during that time.[5]

Sergeant Kevin Moore, an eighteen-year employee of the Lafayette Police Department, testified that he has been a member of the SWAT Team for twelve or fourteen years. Moore was the supervisor on the scene, and when Defendant went into the bedroom, Moore allowed the officers to continue to try to enter the bedroom after Defendant barricaded the door. Moore testified that he had two major concerns at that point in time. First, he was unsure how many children were inside the apartment, and he did not want a child in the room with Defendant.[6] Also, as long as they kept Defendant engaged, they knew where he was and what he was doing; they did not want him to have access to any weapons that might be in the room. Moore testified that this was one of the worst fights he had seen in his eighteen years of experience.

On cross-examination, Moore was shown his report. Under the section "Describe force used," it stated, "Taser twice, drive taser several times, impact

_____

[5]Hartwell testified that the bedroom looked as though a tornado had gone through it.

[6]On cross-examination, Moore was shown the report he prepared where he stated that while they were waiting for SWAT, officers removed *the* two children from the apartment. (Emphasis added.) When asked if he knew that there were two children in the apartment, Moore replied that the report was typed several hours after the fact.

weapon several times on leg, dog bit back and left arm[,] and a broken left leg above ankle." Moore clarified that the portion about the dog bite and the broken ankle was listed under the "suspect injury" section of the report. When asked if he had any reason to dispute the fact that Defendant was tasered eight times, Moore testified that he did not know how many times Defendant had been tasered; he explained that just because a taser is activated does not mean that the subject was tased.

Officer Brock Richard, a patrol officer with the Lafayette Police Department for seven and one-half years, was the only officer who testified that he saw the Defendant swing the baton at officers. Richard was asked why it would be appropriate to draw a weapon when someone took possession of a police baton. He explained:

> Most of the time in our force continuum, what we have is a wheel. What you want to do is you want to meet aggression with aggression, or sometimes slightly over aggression. It's only to protect us and our safety. A lot of times when we're dealing with someone, we don't know what they're capable of. So if they just show you a fist, well, then they give us a taser, a baton or pepper spray to coincide with that, because not all officers are trained prize fighters. So in this situation, when he has a baton, that can possibly hurt me or injure me to the point where I can't -- I can't use anything else. So the only other level for us to go up to would be our lethal weapon or duty weapon.

White testified that he was not one of the four initial responding officers; he responded when a request for on-shift SWAT officers was made. When he arrived on the scene, he saw the other officers enter the apartment. He quickly cleared and secured the downstairs area and then went upstairs. As White went upstairs and turned into the hallway, Defendant quickly approached him and punched him in the face.[7] It broke his glasses, and the blow forced him to stumble back. White's testimony of the events leading up to the point that Defendant entered the bedroom was similar to that of the other officers. White testified that in the bedroom, Defendant continued to resist, acting "wildly and out of control." A minimum of two officers were on each side of him trying to gain control of his upper body and

---

[7]When asked if he recalled what other officers were already there, White said that Brasseaux was upstairs, but White did not know the identity of the other officers.

extremities while he was swinging wildly. Some of the smaller officers were "kind of being thrown around" so White expanded his baton and began to "administer strikes to his outer thigh area to try to gain some type of compliance." White testified that when a baton is used on this area, called the common peroneal, it is "supposed to . . . kind of trick the mind and muscular reflexes to kind of throw them off balance to some degree." A lesser means of force had already been attempted on Defendant.

White described the levels of force they are told to use:

> A      Well, per our general orders as far as the Lafayette Police Department in reference to the use of force policy which is governed under 301.12, the steps are, obviously, officer presence, seeing the uniformed officer. Next is verbal commands. No compliance, you go to soft empty hand techniques, which are kind of pressure points, you have hard empty techniques, which are your strikes and your kicks. At which time pepper spray can be introduced if the subject gets -- is continuing to resist or trying to gain some type of compliance. At that point you have your muscular disruption device, which is your taser. And then you have your baton, and from there on you have lethal force.

White explained that the area he was hitting is considered a "green zone," where there is not a real possibility of a severe injury; this area is used to gain compliance. According to White, the strikes to the outer thigh were ineffective; Defendant grabbed White and "literally just threw [him] onto the bed." As White was on the bed on his back, Defendant came toward him, and White began to strike him in his shoulder area to try to create some distance so he could "re-engage safely." After several strikes, Defendant grabbed White's baton and began to struggle with him for it. Because of the sweat and the pulling, both lost their grips. White testified that he is 6'1", and at that time, he was probably 235 pounds. According to White, there were a couple of "good-sized" fellows in there, and it was "like [they] were Barbie dolls." The other officers' actions were having no effect on Defendant. He also testified that the canine officer, Vance Olivier, gave a "directional bite" command. This is where the dog is leashed, and the officer takes control of the dog by the collar and points the head of the dog toward the area he wants the bite to occur. White has not seen this done many times in his years in the Department; it is most commonly used in close quarters. The canine had little to no effect on Defendant.

11

Eventually, Defendant fell on the ground near the bed, "belly down," but still biting and wildly kicking. The officers attempted to gain compliance with two officers on each side near his arms and some officers near his legs. White knelt down and began to hold Defendant's head; his calf was in close proximity to Defendant, and Defendant bit him. White recalled a taser being deployed while they were in the bedroom, but he did not know how many times it was administered. He explained on cross-examination that he did not see or hear a taser being deployed, but heard someone yelling, "[t]aser, taser."

White sustained some injuries during the fight. He had swelling on the left side of his face from the initial punch, a cut over the bridge of his nose (from his glasses being broken), a twisted knee, and a bite on his right calf which broke the skin.[8] The Acadian Ambulance technicians treated the injured officers on the scene. White testified that there was a cut above his nose and swelling on his cheek that required an ice pack. He was given a prescription for an oral antibiotic for the bite wound. The following week, he consulted a city nurse to inquire as to whether any blood tests had been performed on Defendant so that he would know if he had been exposed to any disease, infection, etc., as a result of the bite. After learning that blood tests had not been performed on Defendant, White drafted a search warrant to obtain blood

_____

[8]The medical report states:

> It is really not a bite, just an abrasion on the right calf that does have the slightest little peel of skin. It is nothing more than that. There is truly not a bite beyond that point. There is some speckling at that site, but no punctures, no bony involvement.
>
> . . . .
>
> IMPRESSION: 1. INJURY TO THE CALF THAT IS REPORTED AS A BITE AND CERTAINLY OCCURRED AS AN ATTEMPTED BITE, BUT REALLY IS NOTHING MORE THAN AN ABRASION AND A PEEL OF SKIN.

White testified that he did not agree with the physician's assessment of his bite wound. He described the bite injury at the time of the incident as follows:

> Redness of the skin, discoloration. At the time, there was tenderness, swelling, minor amounts of blood protruding from underneath the skin as a result of the bite wound. Pieces of skin obscured as far as almost like if you had slid on concrete, the skin kind of peeling off and being lumpy because of the tissue that's exposed. It's not able to release from the body. It's almost like a tacky material.

samples from Defendant for testing. White subsequently learned that there was "a positive exposure, at which time I was tested for HIV and then placed on a series of three (3) shots . . . for hepatitis." Additionally, White later noticed a "deadening feeling" in the center of the bite wound that felt like dead tissue. He subsequently was referred to a physical therapist and underwent "a series of tests as far as massage therapy and also exercises to try to get back some of the strength." He was advised that regaining feeling in that area may take months, years, or may never happen. At the time of trial, White testified the area was "still deadened."

Officer Raymond Overby of the Lafayette Police Department testified that he also arrived on the scene after the initial responding officers. As Overby was upstairs handing the child to Hartwell, he felt someone grab for his weapon, "lifted [him] off the ground just about." He was lifted almost completely off his feet and thought that his weapon had been taken. Overby dropped to the ground and, as trained, "covered on it" to see if his weapon was still there. His weapon was intact, but his baton, which was directly behind his weapon, had been removed.[9]

According to Overby, once in the bedroom, Officer Griffin "shot a taser down into [the Defendant.] This was ineffective, so Overby took the taser from Griffin and began drive-stunning in an attempt to gain control of Defendant's hands; the taser had little effect on Defendant. Three or four of the officers got shocked by the taser, and the jolt caused Overby to knock the cartridge off the taser. Eventually, officers were able to get one hand in a handcuff; after a struggle, they were able to get the second arm in as well. At that point, Defendant began kicking at officers, so they had to sit on his legs. Overby testified he did not tase Defendant once he was in handcuffs. He also testified that it would not surprise him that the taser report showed the taser had been deployed seven times. Overby explained that their policy is that if someone is actively resisting, they can deploy the taser and can continue to use whatever force they need to use until the suspect can be taken into custody safely. According to

[9]Overby testified his holster is a "double retention" holster, and it has a thumb strap that will not allow "it to come out unless it's switched over."

Overby, if Defendant had swung the baton at an officer, deadly force could have been used.

Erin Richard, a paramedic for Acadian Ambulance, testified that she recalled treating White for an injury to his face "with the eyeglasses" and a bite wound to his right calf which she concluded was a human bite based on what White said. When asked what caused the redness, she explained that it was bruising from broken blood vessels. In her opinion as a paramedic, she said that the medical treatment she rendered to White was necessary. She did not recall the details of Airhart's injuries. On cross-examination, Richard testified that they washed White's bite mark and his eyes, which had some blood in them. He was transported to the hospital for further evaluation. She acknowledged that anyone could have washed the wound at home.

Defendant testified that he and Cantrelle have two children together, a son and daughter. The daughter is not his biological child, but he has raised her from the age of one. According to Defendant, he was present at Cantrelle's house that day at her invitation. He had been there since 8:00 a.m. and had eaten lunch and dinner there. He first saw officers when they were upstairs by his room. Officers told him to get down on the ground, which he did, and one officer hit him on the top of his head. Defendant said that he stood up, and an officer grabbed and twisted Defendant's arm. Another officer grabbed and twisted his arm, and they "held [him]." According to Defendant, the two officers holding him were smirking. Another "guy" was looking at what Defendant thought was a gun, and he pointed it at Defendant and hollered "taser," and officers let him go. Defendant was then hit with the taser. Defendant testified that he had a friend who died from a taser, a fact he was aware of the night of this incident. When asked how he reacted to the taser, Defendant replied that he "locked up and pee'd on [himself]."[10] When he was about to go in his room, he was grabbed again, held, and tased. At this point, Defendant backed into his room, put a dresser in front of the door, and tried to jump out of the window because he feared

_____

[10]On cross-examination, Defendant testified that he "hit the ground" when he was tased, but he did not stay down because he was scared. So, he got up and ran toward his room.

14

for his life.[11] He changed his mind when saw a "big canine" and did not want to get bitten. He testified that when he turned around, officers had "done bust in the room[,] and they just powered up on me." According to Defendant, he was tasered again in the bedroom, but he did not know how many times. He testified "licks" were coming from everywhere and that he stopped fighting when he felt his ankle break. At that point, he sat on the bed, and then a "dude" came from behind him and let his dog bite Defendant's back while officers were holding him. Defendant testified that he was ordered to get on the floor and that one guy said, "Break his arm," so Defendant stuck his arm behind his back. He was handcuffed and was shocked in the neck with the taser. The person in front of him then began kicking Defendant in the face. His hands and feet were cuffed, and he was taken downstairs and then to the hospital where he was treated for a broken ankle and cuts on his eye and foot. Defendant denied ever grabbing for a gun.

On cross-examination, Defendant testified that he was aware that there was a protective order in place prohibiting him from being at the residence and that the police are supposed to arrest him on sight. He testified that he never looked outside and did not hear the police knocking on the door. He denied taking the phone from Cantrelle while she was talking to her mother, and he denied that he and Cantrelle had an argument that night. According to Defendant, he was never told that he was under arrest; he was just told to get down on the floor.

When asked why he stood up when police had ordered him to get down, he said that he was scared of what was going to happen. Defendant denied swinging his arms at the officers, but he admitted that he pushed them off him. He testified that he was afraid they were going to kill him. Defendant testified that he was not fighting with police and that because he is a "big dude," if he was fighting, he would have done more damage than "some little scratches." He denied ever having the baton in his

---

[11]When asked why he feared for his life, Defendant responded, "[b]ecause the way the taser felt and from my friend dying."

hand.  Defendant testified that the officers drew their guns on him right when they came up the stairs.  Defendant denied biting Airhart and White.

In defense counsel's brief to this court, she first contends that Defendant was justified in defending himself against the excessive force used by the police officers. While a defendant has the right to resist an unlawful arrest, Defendant does not question the legality of the arrest in this case.  Furthermore, Defendant admitted at trial that he was aware that there was a protective order in place prohibiting from being at Cantrelle's residence and that police would arrest him on sight.

Louisiana Revised Statutes 14:19 provides in pertinent part:

> A. The use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person or a forcible offense or trespass against property in a person's lawful possession, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this Section shall not apply where the force or violence results in a homicide.

In *Hudson v. Hughes*, 98 F.3d 868, 873 (5th Cir. 1996) (footnote omitted), the federal Fifth Circuit noted:

> In Louisiana, self-defense is a justification defense to the crime of battery of an officer. *See* LSA-R.S. 14:19; *Louisiana v. Blancaneaux*, 535 So.2d 1341 (La.App.1988)(discussing justification defense to battery of officer conviction).  To make out a justification defense, the criminal defendant charged with battery of an officer must show that his use of force against an officer was both reasonable and necessary to prevent a forcible offense against himself. *Blancaneaux*, 535 So.2d at 1342.

Louisiana Code of Criminal Procedure Article 220 states:

> A person shall submit peaceably to a lawful arrest.  The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained.

In *Hall v. City of Shreveport*, 45,205, pp. 10-12 (La.App. 2 Cir. 4/28/10), 36 So.3d 419, 425-26, the second circuit discussed several cases involving excessive use of force (*see  Nelson v. City of Shreveport*, 40,494 (La.App.2d Cir.1/27/06), 921 So.2d 1111, *writs denied*, 06-453 (La.5/5/06), 927 So.2d 313, 06-600 (La.5/5/06), 927 So.2d 317;  *Patton v. Self*, 06-1029 (La.App. 3d Cir.3/7/07), 952 So.2d 874; *Labauve v. State of Louisiana*, 618 So.2d 1187 (La.App. 3d Cir.1993), *writ denied*,

16

624 So.2d 1235 (La.1993); *and Corkern v. Smith*, 06-1569 (La.App. 3d Cir.6/6/07), 960 So.2d 1152, *writ denied*, 07-1803 (La.1/25/08), 973 So.2d 754)) and concluded that the facts of the case before it did not support a finding that excessive force was used in Hall's arrest:

Notably, in this appeal, Hall does not assert that Officer Sotak lacked probable cause to arrest her for her flight from the officer or that under the circumstances he did not have the right to physically restrain her in effectuating the arrest and to take her into custody. She argues, however, that the escalation of the officer's actions from his initial verbal commands to his directive for Hall to go to the ground was unreasonable. Her argument thus questions Officer Sotak's decision to order her to the ground which led to the force used against her and to her alleged injuries. Additionally, the actual physical force with which Officer Sotak got Hall to the ground is questioned in Hall's assignment of error. Officer Sotak claims that he "walked" Hall "down to the ground so she wouldn't slam down on the ground." Hall testified that Officer Sotak "pushed [her] to the ground" and that she "fell to the ground" injuring her lower back, upper shoulders and neck.

Under La.C.Cr.P. art. 220 and the factors enumerated in *Stroik*, *supra*, we will first review the reasonableness of Officer Sotak's manner of detention of Hall by ordering her to the ground. Because of Hall's lengthy flight from the officer's traffic pursuit, the nature of the offense had become more serious than a mere routine traffic stop. This was not a citation-only traffic offense, as the flight from the officer which is proscribed in the Louisiana Criminal Code allowed for an arrest and the taking of Hall into custody. Additionally, given the exigency of the moment, the officer had not yet determined whether other more dangerous crimes were involved and had served as the reason for the flight from the officer. Hall's vehicle had heavily tinted glass, and Officer Sotak's suspicion and fear of another party or a weapon being in the vehicle were warranted. From the video, the officer's manner of addressing Hall as she exited the car reflected this uncertainty of the situation and his fear; and to the contrary, it did not reflect maliciousness or hostility toward an unruly driver by an angry officer. This uncertainty of the extent of the criminal activity was made more confusing by Hall's erratic actions and speech as she exited the automobile. Her physical size and strength also were significant considerations for the officer. While there may have been an alternative method of arrest and detention, short of ordering her to the ground, the officer's chosen method under the facts to secure the situation and ensure the officer's safety cannot be said to be unreasonable.

Concerning the force with which Hall fell to the ground, the videotape of the incident shows the parties' actions outside their vehicles after Hall's automobile was stopped. The view from the dash camera nevertheless was partially blocked by the back half of Hall's automobile as she stood beside it after exiting. As Officer Sotak began the takedown maneuver grabbing Hall's arm from behind, the back panel of the automobile and its roof prevented the view of what happened as the parties' downward movement began. The recorded tape to that point, however, shows Officer Sotak's repeated instruction to Hall and the force of his action at the beginning of the maneuver. The

video to that point does not indicate that Hall was thrown to the ground or that Officer Sotak's actions were otherwise unreasonable. The audio of the parties' struggle on the ground does not reveal any scream of pain from Hall or inappropriate language from Officer Sotak giving any indication of excessive force used in the maneuver. After the handcuffs were applied, the video shows that Hall immediately was helped up to her feet. She was not then complaining of pain.

The trial court as the trier-of-fact heard the testimony of the parties and eyewitnesses of the force Hall received as she went to the ground and out of view of the camera. From the perspective of Hall's fellow employee eyewitnesses, they did not understand the necessity for the takedown and handcuffing of their friend. Officer Sotak did not have that understanding of the situation as reviewed above. Accordingly, from our review of all the testimony and the videotape, we find that the trial court could conclude that only a reasonable amount of force was applied by the officer as he attempted to arrest Hall and secure the situation for his further investigation. In comparison to the other rulings of officer misconduct reviewed above, the circumstances of this case and Officer Sotak's actions throughout the entire incident allow for the trial court's determination that excessive force was not used in the arrest.

Defendant contends that he was not the aggressor, that he was compliant with the officers until he had reason to fear for his safety, and that he was justified in defending himself against the excessive force used by police. Had this force not been used, he claims that his arrest would have been effected without injury to the officers.

The credibility determination made by the trier of fact was obviously resolved against Defendant in favor of the testimony presented by the State. The officers' testimonies revealed that Defendant was the first to become physically abusive and that they used reasonable force to effect the arrest with their force escalating in response to the level of violence displayed by Defendant. We find that Defendant's use of force was neither reasonable nor apparently necessary to prevent a forcible offense against him; thus, the justification defense is inapplicable. Further, "[a] person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La.R.S. 14:21. Even though Defendant "withdrew" to his room and barricaded the door, he was not seeking to discontinue the conflict. The record indicates that this was simply a further attempt to evade arrest, and once officers

18

entered the room, Defendant's violence continued. Thus we find that this assignment of error has no merit.

Battery is defined in La.R.S. 14:33 in pertinent part as the "intentional use of force or violence upon the person of another[.]" It is a general intent crime,[12] which La.R.S. 14:10(2) defines:

> General criminal intent is present whenever there is specific intent, and also when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.

Defendant argues on appeal that it is possible that since the administration of most of the drive tasers occurred around the time Defendant was taken down to the floor and eventually subdued, that it is likely that he did not have control of his muscles during the time the "bites" allegedly occurred. Thus, he contends that the State failed to show the "bites" were intentional acts and not involuntary responses as a result of being tasered. Defendant did not advance this theory of defense at trial; rather, his defense was focused on one of justification for his actions due to fear of what the officers might do and knowing someone who died after being tasered. At trial, there was also a question as to whether the injuries to the officers were in fact bites because Defendant denied biting the officers. Counsel cannot now advance a defense of lack of intent as it is an argument of a different genera than that set forth at trial.

In *State v. Duvall*, 97-2173 (La.App. 1 Cir. 12/28/99), 747 So.2d 793, *writ denied*, 00-1362 (La. 2/16/01), 785 So.2d 838, the defendant attempted to present a defense both alternative to and inconsistent with the defense he presented in the trial court. The court held in pertinent part:

> Upon review, the supreme court [in *State v. Juluke*, 98-0341, pp. 4-5 (La.1/8/99), 725 So.2d 1291], reversed the Fourth Circuit, noting:
>
>> The *Jackson* standard also does not provide a defendant with a means of splitting alternative and

---

[12]Louisiana Revised Statutes 14:11 states that "in the absence of qualifying provisions, the terms 'intent' and 'intentional' have reference to 'general criminal intent.'"

> inconsistent defenses in different forums, raising one defense before the jury and when that fails, a second defense [presupposing] a different set of facts in an appellate court conducting sufficiency review under *Jackson* and La.C.Cr.P. art. 821(E).

*Juluke*, 98-0341 at pp. 4-5, 725 So.2d at 1293.

> In the instant assignment of error, defendant attempts to present a defense both alternative to and inconsistent with the defense he presented in the trial court. To permit him to argue the defense on appeal would violate the above holding of *Juluke* and allow him the unfair advantage of urging a defense that the State had no reason to challenge.

> . . . .

> Defendant's defense on appeal is inconsistent with the defense that he presented at trial because a defense that a shooting was committed in sudden passion or heat of blood is inconsistent with a defense that a shooting was accidental. In the former instance, an intent to fire the weapon exists, while in the latter instance, no such intent is present.

> . . . .

> For the foregoing reasons, the argument that the offense was manslaughter, rather than second degree murder, is not properly before this court and will not be considered.

*Id*. at 799-800.

Accordingly, this court finds that this issue is not properly before this court and will not be considered.

Defense counsel notes that a necessary element of felony-grade battery of a police officer is proof that the battery produced an injury *requiring* medical attention. Since the term "require" is not vague, defense counsel contends it should not be extended beyond its meaning. Defense counsel acknowledges that the case law has, on occasion, extended the meaning of "requires" to encompass situations where medical attention was "recommended."

Defense counsel cites *State v. Boyd*, 97-579, pp. 3-5 (La. 4/14/98), 710 So.2d 1074,1077, but points out that the *Boyd* court addressed the vagueness of the term "medical attention" and did not evaluate whether a particular injury "required" medical attention:

20

The complained of phrase has an easily understood meaning within the context of its use in the statute. We find that the clear and unambiguous wording of the statute means that any battery of a police officer which necessitates that the officer seek the care of doctors, nurses or other medical services, including but not limited to operations, hospitals, and institutional care incurred primarily for the prevention or alleviation of a physical or mental defect or illness sustained in the battery is "require[d] medical attention."

We reject the trial court's assessment that the phrase could "mean that the officer was examined and released without treatment" or where the officer has "a band aid [*sic*] [applied] by the officer or another non-physician party." These hypothetical situations, without any other facts, are obviously not injuries which require medical attention. The mere fact that a battered officer seeks medical attention is not sufficient to make the treatment medically necessary. We find that "an injury which requires medical attention" is an injury where the battered officer receives a battery for which the attention of a medical professional (nurse, paramedic, doctor, etc.) is required. For example, while a simple scratch normally would not require medical attention, a scratch, bite or needle prick where the officer is possibly exposed to a disease which necessitates testing would be sufficient to require medical attention.

Notwithstanding that the term may be subjective in nature and susceptible to interpretation, the statute is not automatically rendered unconstitutionally vague. The phrase gives adequate warning of the conduct proscribed and provides a workable standard for judges and juries to fairly administer the law.

This court addressed whether an officer suffered injury requiring medical attention in *State v. Ahlfeldt*, 01-765, pp. 7-8 (La.App. 3 Cir. 12/12/01), 801 So.2d 663, 667-68, *writ denied*, 02-128 (La. 10/25/02), 827 So.2d 1169:

Trooper Pitts testified that the Defendant bit him on the finger and on the arm and also managed to cut him on the abdomen while he was being restrained. Trooper Pitts also showed the jury the remaining scars from his injuries. Defendant admitted biting Trooper Pitts and, in fact, testified that he bit down "very hard."

Trooper Pitts' discharge instructions from the emergency room consisted of treatment instructions and information pertaining to human bite wounds. The information supplied by Rapides Regional Emergency Department recognizes that human bites often become infected and that bacteria often enters the wound through a break in the skin, causing infection. Trooper Pitts' treatment consisted of an examination of the bites on his finger and arm, and an examination of the cut on his abdomen, which was treated with an application of Betadine.

In *State v. Boyd*, 97-0579, pp. 3-4 (La.4/14/98); 710 So.2d 1074, 1077, the supreme court wrote:

We find that the clear and unambiguous wording of the statute means that any battery of a police officer which necessitates that the officer seek the care of doctors, nurses or other medical services, including but not limited to

21

operations, hospitals, and institutional care incurred primarily for the prevention or alleviation of a physical or mental defect or illness sustained in the battery is "require[d] medical attention."

. . . The mere fact that a battered officer seeks medical attention is not sufficient to make the treatment medically necessary. We find that 'an injury which requires medical attention' is an injury where the battered officer receives a battery for which the attention of a medical professional (nurse, paramedic, doctor, etc.) is required. For example, while a simple scratch normally would not require medical attention, a scratch, bite or needle prick where the officer is possibly exposed to a disease which necessitates testing would be sufficient to require medical attention.

We, therefore, find that the jury, after viewing the evidence in the light most favorable to the prosecution, was reasonable in finding that Trooper Pitts' injuries required medical attention, as provided by La.R.S. 14:34.2(B)(3). This assignment is likewise without merit.

Both White and Airhart testified that they were bitten by Defendant. Though the medical reports state that there was no puncture, each officer was treated with an antibiotic (one topical and one oral) for his wound. Airhart's hand injury obviously required x-rays to determine whether further treatment was needed. In addition to being treated at the time of the incident, White underwent medical treatment for the bite at a later date. We find that the facts of this case support a finding that the injuries suffered by Airhart and White required medical attention.

*Presence of Alternate Jurors*

Defense counsel contends that the trial court erred in failing to grant Defendant's motion for a mistrial based on the presence of the alternate juror in jury deliberations. This issue was raised in Defendant's motion for new trial, which was denied.

After closing instructions were given to the jury, the court released the alternate juror. After deliberations, when the jury was brought back in the courtroom to return the verdict, the judge was informed that the alternate juror had been present in the jury deliberation room. The court questioned the alternate juror, and she said that she did not vote, but she did ask some questions. She explained that she had misunderstood the judge and thought that her presence in the jury room was

22

permissible. Additionally, one of the jurors who had previously served on a jury told the alternate juror that she could go in. Defense counsel moved for a mistrial due to the alternate juror's presence during deliberations. The court asked the jurors if their verdict or deliberations were affected in any way by the presence of the alternate juror; no one responded. Then, one juror spoke up and said that the alternate juror did not say anything, that she just sat there and did not participate in any discussion. At this point, on motion of the State, the jurors were required to respond individually to the question of whether their verdict or deliberations were affected in any way by the presence of the alternate juror, and each one of them individually responded that they were not. Defense counsel then reminded the court that the alternative juror admitted that she had asked a couple of questions, and counsel asked if any of the jurors disputed that. The response indicated that she did not take part in discussions and that her only question was in the nature of "what's that" or "can I see that."

The alternate juror was questioned by defense counsel and indicated that she may have asked questions as to which pictures were of which injury and in what order the officers entered the room. She further stated that she did not voice an opinion as to what the evidence meant.

Defense counsel points out that the jury convicted Defendant of only the counts involving officers who suffered "bite marks." She contends that the alternate juror's reference to the officers' injuries as "bite marks" went to a pivotal question in the case and was an expression by her as to what was depicted in the photographs. Defense counsel argues that this was an important factor in the trial and that the alternate juror's comments cannot be separated from the ultimate vote in this case. Additionally, defense counsel contends that by failing to conduct individual questioning of the jurors, the defense was denied the opportunity to create a record as to each juror's knowledge of what was said by the alternate juror.

A similar situation was before this court in *State v. Anderson*, 08-962, pp. 15-21 (La.App. 3 Cir. 2/4/09), 2 So.3d 622, 632-35[13], *writ denied*, 09-518 (La. 11/20/09), 25 So.3d 786:

> In this assignment, the Defendant argues that the participation of an alternate juror in the jury deliberations is a patent structural error. The Defendant maintains that, because the alternate juror asked a specific question during jury deliberations, his convictions must be reversed. Further, the Defendant contends that the discovery of the alternate juror being involved during deliberations came too late for the trial court to seek specific evidence as to the violation.

> In support of his argument, the Defendant refers to *State v. Barber*, 97-2749 (La.4/24/98), 708 So.2d 1054. From the limited facts of this writ opinion, it appears that alternate jurors were present during deliberations. As a result thereby, the case was remanded to the trial court for an evidentiary hearing to determine if the outcome was affected by the presence of alternate jurors and to what extent the outcome was affected. In rendering its ruling, the supreme court in *Barber* relied on La.Code Evid. art. 606(B), and concluded as follows:

>> Participation by alternates in deliberations is an extraneous influence on the jury representing *a prima facie* case of prejudice requiring reversal. La.C.E. art. 606(B); *State v. Howard*, 573 So.2d 481 (La.1991); *State v. Smith*, 367 So.2d 857 (La.1979). Louisiana courts are "required to take evidence upon well-pleaded allegations of prejudicial juror misconduct...." *State v. Graham*, 422 So.2d 123, 131-132 (La.1982); *State v. Horne*, 679 So.2d 953, 958 (La.App. 2nd Cir.8/21/96), *writ denied*, 688 So.2d 521 (La.2/21/97); *State v. Sanders*, 539 So.2d 114, 121 (La.App. 2nd Cir.), *writ denied*, 546 So.2d 1212 (La.1989); *State v. Duncan*, 563 So.2d 1269, 1272 (La.App. 1st Cir.1990). *See also State v. Searile*, 643 So.2d 455, 457-458 (La.App. 3rd Cir.10/5/94). At the conclusion of the hearing, the trial court shall determine whether a new trial or other appropriate relief is required, reserving to the parties a right to seek review of the ruling.

> *Id*. at 1054.

---

[13]Prior to *Barber*, the supreme court decided *State v. Howard*, 573 So.2d 481 (La.1991), a case in which the alternate juror was allowed to take part in deliberations, but did not vote. The final vote was ten to two:

> The alternate juror's participation in jury deliberations (as opposed to the alternate juror's mere presence in the jury room) constituted an extraneous influence on the jury. Evidence of this participation established a prima facie case of prejudice to the defendant. Cf. *State v. Duplissey*, 550 So.2d 590 (La.1989).

> The conviction is reversed, and the case is remanded to the district court for further proceedings.

*Id.*

24

The States contends, on the other hand, that the presumption of prejudice as a result of an unauthorized communication by a non-juror during trial is not conclusive. The State, however, has the burden to establish, after notice to the Defendant and a hearing, that the contact between the non-juror and juror was harmless to the Defendant. In support of its argument, the State refers to *State v. Bibb*, 626 So.2d 913, 922 (La.App. 5 Cir.1993), *writ denied*, 93-3127 (La.9/16/94), 642 So.2d 188, wherein the court addressed the issue as follows:

> Initially in any trial, there is a presumption of jury impartiality. *United States v. Winkle*, 587 F.2d 705, 714 (5th Cir.), *cert denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). However, any unauthorized communication, contact, or tampering directly or indirectly, made by a non-juror with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial, if not made in accordance with rules of court and the instructions and directions of the court made during the trial, with full knowledge of all the parties. The presumption is not conclusive, but the burden rests heavily upon the state to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to defendant. *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *State v. Marchand*, 362 So.2d at 1092. Prejudice may be shown by evidence that an extrinsic factual matter tainted the jury's deliberations. Thus, an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality and shifts the burden to the state to show that the influence demonstrated was not prejudicial. *United States v. O'Keefe*, 722 F.2d 1175, 1179 (5th Cir.1983); *United States v. Howard*, 506 F.2d 865, 869 (5th Cir.1975); *State v. Sinegal*, 393 So.2d 684, 687 (La.1981).

After the trial court's instructions to the jury in the instant case, the jury retired to deliberate. During deliberation, the jurors sent out a note asking to review the Defendant's videotaped interrogation and Mr. Boudreaux's two written statements. After calling the jury back into the courtroom and explaining why their request was denied, the trial court stated:

> I committed an oversight when you retired to deliberate because the alternate, Ms. Knight, you're not supposed to be in there. Your duties are concluded when we reach the end of the trial and we've not lost a regular juror. So you haven't had to replace anybody.
>
> So you are—your services are complete. So the twelve (12) regular jurors will now retire to the deliberation room to continue your deliberations.
>
> . . . .

We agree that the presence of the alternate juror and the fact that she asked a question during jury deliberation triggers the presumption of prejudice; however, we find that said presumption was adequately

rebutted at trial. The trial court addressed Ms. Knight's participation in the jury's discussion and ascertained that she asked only one question about the existence of additional evidence; however, she did not express to the jurors an opinion as to the guilt or innocence of the Defendant. Additionally, the trial court questioned the jurors and confirmed that this was the extent of Ms. Knight's participation in jury deliberation. Lastly, the jurors denied that Ms. Knight's presence and question during jury deliberation had any effect on how they voted. Further, the jurors indicated that, had they begun deliberations without Ms. Knight, each juror's vote would have been the same regardless of Ms. Knight's presence and question.

Although given the opportunity at trial, the Defendant did not question the jurors or offer any evidence to dispute the testimony of the jurors. Further, the Defendant does not point to any statute or jurisprudence, nor are we aware of any legal basis, to conclude that the collective questioning of the jurors was inadequate to rebut the presumption of prejudice. Accordingly, we find this alleged error to be without merit.

In that case, the alternate juror indicated that she had participated in deliberations in that she had asked a question. However, the jurors denied that her presence had an effect on their votes.

Defense counsel points out that in this case, the alternate juror was not removed from the deliberation room prior to the final deliberation, making the situation distinguishable from that presented in *Anderson.*

We find that the presence of the alternate juror to be harmless error in this case. When questioned, each juror individually affirmed that neither their deliberations nor verdict were affected in any way by the presence of the alternate juror. The alternate juror did not voice her opinion regarding the outcome of the case, and while she made statements to link up injuries to officers for identification purpose and referred to the injuries as "bites," the jurors denied that she affected their deliberation or verdict. Further, as in *Anderson*, Defendant does not point to any statute or jurisprudence to support a finding that the group questioning of the jurors was insufficient to refute the presumption of prejudice. This assignment of error has no merit.[14]

---

[14]Defense counsel notes in her brief that the record does not indicate "who the female juror was that first spoke up. She contends that this was important because if this was the juror who told the alternate that it was permissible for her to join them during deliberations, "she may have reason to downplay any influence she felt as the result of comments made by the alternate juror." We do not address this contention as the trial court questioned the alternate juror about the comments she made and thus did not need to rely on Ms. McHugh's summation.

*Excessiveness of Sentence*

Defense counsel contends that Defendant's sentence is excessive based on the facts that he has no prior felony record, none of the officers' injuries were severe, and for the reasons set forth in the defense's motion for suspended sentence. The reasons given in that motion are: Defendant acted under strong provocation, his conduct was justified, the victims will be compensated since Defendant is willing to pay restitution, the lack of a felony record,[15] the circumstances are unlikely to recur, Defendant will respond to probationary treatment, and incarceration will cause a hardship to Defendant's dependents and co-workers. Defense counsel claims that the trial court did not sufficiently comply with La.Code Crim.P. art. 894.1 in that it did not articulate reasons for imposition of consecutive two-year sentences.

> Louisiana Code of Criminal Procedure Article 881.1(E) requires a defendant to set forth the specific grounds on which a motion to reconsider may be based. Failure to include a specific ground upon which a motion to reconsider sentence may be based "shall preclude ... the defendant from raising an objection to the sentence or from urging any ground not raised in the motion on appeal or review." *Id*. In the present case, although the defendant generally raised the issue of excessiveness in his motion to reconsider sentence, he failed to specifically allege that the trial court failed to consider the factors of La.Code Crim.P. art. 894.1. Accordingly, because that claim was not specifically set forth in his motion to reconsider, it cannot be reviewed in this appeal, *State v. Landry*, 09-260 (La.App. 3 Cir. 11/4/09), 21 So.3d 1148, *writ denied*, 09-2577 (La.5/21/10), 36 So.3d 229, and our review of the defendant's sentence is restricted to his bare claim of excessiveness. *State v. Mims*, 619 So.2d 1059 (La.1993).

> The sentencing court has broad discretion in imposing penalties for criminal convictions:

>> A sentence which falls within the statutory limits may be excessive under certain circumstances. To constitute an excessive sentence, this Court must find that the penalty is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no reasonable contribution to acceptable penal goals and therefore, is nothing more than the needless imposition of pain and suffering. The trial judge has broad discretion, and a reviewing court may not set sentences aside absent a manifest abuse of discretion.

---

[15]Defendant testified at sentencing that he had no prior felony convictions, however, he did not deny having previous convictions in 1997 of disturbing the peace, in 2005 for domestic battery, and in 2000 for simple battery (reduced from aggravated battery).

> *State v. Guzman*, 99-1753, 99-1528, p. 15 (La.5/16/00), 769 So.2d 1158, 1167 (citations omitted). "The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La.2/1/02), 808 So.2d 331.

*State v. Prejean*, 10-480, pp. 2-3 (La.App. 3 Cir. 11/3/10), 50 So.3d 249, 251-52.

In this case, neither the motion to reconsider sentence nor the memorandum in support thereof raise the issue of noncompliance with La.Code Crim.P. art. 894.1. Rather, the arguments focused on the claims that Defendant's sentences are excessive and that concurrent sentences should have been imposed because the convictions arose out of the same course of conduct. Accordingly, we find that the claim regarding noncompliance with La.Code Crim.P. Art. 894.1 should not be reviewed.

The relevant penalty provision in this case carries a fine of not more than $1,000 or imprisonment with or without hard labor for not less than one year nor more than five years, or both. On each count, a fine of $1,000 was imposed and the Defendant was sentenced to two years at hard labor without benefit of parole, probation, or suspension of sentence, to run consecutively with each other.

Prior to imposing sentence, the court stated:

I'm obligated to look at all mitigating and aggravating circumstances. I can find nothing in mitigation.

In aggravation, you have a violent history, you inflicted permanent injury on the officers, the two (2) victims here, and it was two (2) different victims. It wasn't like you threw one punch and, you know, hit both victims with the one punch. It was separate blows that injured the different victims.

The Court is looking at that in imposing the type of sentence that I'm going to impose. And the Court feels an appropriate sentence - - and I will sentence you to two (2) years hard labor on each count, consecutive with each other . . . .

In *State v. Barber*, 34,832 (La.App. 2 Cir. 6/20/01), 793 So.2d 251, the second circuit upheld imposition of the maximum five-year sentence for battery on a police officer where the defendant was a fifth felony offender. The appellate court considered the serious injury inflicted on the officer, the defendant's criminal history, the fact the defendant concealed his identity at arrest, and the benefit gained by

entering the plea agreement. The officer in *Barber* suffered dislocated fingers and the pulling or severing of the tendons in his right hand.

We find that the imposition of a two-year sentence on each count is not excessive. For his crimes, Defendant faced a five-year hard labor sentence on each count, yet he received lower range sentences of two years on each count. Under the facts of this case, these sentences do not shock the sense of justice, and the trial court did not abuse its vast discretion in imposing two-year sentences.

Next, defense counsel argues that concurrent sentences should have been imposed as the offenses arose out of the same act or transaction. Further, she contends the trial court failed to articulate sufficient justification for the imposition of consecutive sentences.

Defendant's claim that the judge failed to articulate sufficient justification for the imposition of consecutive sentences should not be addressed due to the failure to raise this particular issue in his motion to reconsider sentence:

> Finally, Defendant claims that the trial court did not cite any reasons or basis for ordering consecutive sentences. In *State v. Robinson*, 07-1424, p. 11 (La.App. 3 Cir. 4/30/08), 981 So.2d 867, 875, *writ denied*, 08-1314 (La.2/13/09), 999 So.2d 1144, this court held:
>
>> Defendant argues that the trial court erred by failing to articulate the factors it used in formulating the sentence, and in determining the sentences should run consecutively.
>>
>> This court observes that Defendant did not object to the sentences and did not file a motion to reconsider sentence. Although he cites jurisprudence regarding excessive sentences, he does not argue that his sentences are excessive in length. Therefore, his claim regarding La.Code Crim.P. art. 894.1 has not been preserved for review. La.Code Crim.P. art. 881.1.
>>
>> Defendant also argues that the trial court erred by failing to sufficiently explain why it ordered that the sentences run consecutively. However, this court finds this argument should not be considered, for the reasons noted in the previous paragraph.
>
> As in *Robinson*, Defendant did not object to his sentences nor file a motion to reconsider sentence. Accordingly, this portion of Defendant's claim will not be considered.

*State v. Wood*, 08-1511, pp. 23-24 (La.App. 3 Cir. 6/3/09), 11 So.3d 701, 715; *See also State v. Handley*, 96-631 (La.App. 1 Cir. 12/20/96), 686 So.2d 149, *writ denied*, 97-189 (La. 6/13/97), 695 So.2d 986.

As to the issue of whether imposition of consecutive sentences was appropriate, the following are factors to be considered:

> In *State v. Hawkins*, 06-1599, pp. 1-2 (La.App. 3 Cir. 5/2/07), 956 So.2d 146, 148-49, *writ denied*, 07-1156 (La.12/7/07), 969 So.2d 627, this court discussed the appropriateness of ordering consecutive sentences as follows:
>
> > Louisiana Code of Criminal Procedure Article 883 states, in pertinent part, "If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively." As noted by this court in *State v. Vollm*, 04-837, p. 6 (La.App. 3 Cir. 11/10/04), 887 So.2d 664, 669, "The Louisiana Supreme Court has recognized that although concurrent sentencing is favored, it is within the trial judge's discretion to impose sentences consecutively based on factors including the defendant's criminal record, the severity or violent nature of the crimes, or the danger the defendant poses to the public. *State v. Thomas*, 98-1144 (La.10/9/98), 719 So.2d 49." *See also State v. Walker*, 00-3200 (La.10/12/01), 799 So.2d 461.
>
> The court in *Hawkins* also addressed the factors to be considered in ordering consecutive sentences. First, the court noted that the imposition of consecutive sentences requires particular justification which must be articulated beyond the standard factors considered in the sentencing guidelines set forth in La.Code Crim.P. art. 894.1. Next, the court observed a host of factors identified by various courts across the state to be considered in making such a determination. These factors were compiled by the second circuit in *State v. Coleman*, 32,906, p. 42 (La.App. 2 Cir. 4/5/00), 756 So.2d 1218, 1247-48, *writ denied*, 00-1572 (La.3/23/01), 787 So.2d 1010 (citations omitted), as follows:
>
> > [T]he defendant's criminal history; the gravity or dangerousness of the offense; the viciousness of the crimes; the harm done to the victims; whether the defendant constitutes an unusual risk of danger to the public; the defendant's apparent disregard for the property of others; the potential for the defendant's rehabilitation; and whether the defendant has received a benefit from a plea bargain.
>
> . . . .
>
> In the instant case, the trial court articulated several factors for imposing consecutive sentences, including the dangerousness and viciousness of the crime and the harm done to the victim. Additionally,

the trial court noted the fact that the Defendant derived a significant benefit from his plea agreement, thereby greatly reducing his sentencing exposure. Prior to his plea, the Defendant faced a maximum possible sentence of fifty years without benefit of parole, probation or suspension of sentence for attempted first degree murder. La.R.S. 14:27 and 14:30. As such, we find that the trial court adequately and appropriately expressed its reasons for imposing consecutive sentences and, thus, did not abuse its discretion.

*State v. Shepherd*, 08-1556, pp. 3-6 (La.App. 3 Cir. 6/3/09), 11 So.3d 729, 731-33 (footnote omitted). *See also State v. Leyva-Martinez*, 07-1255 (La.App. 3 Cir. 4/30/08), 981 So.2d 276, *writ denied*, 08-1200 (La.1/30/09), 999 So.2d 747; *Hawkins*, 956 So.2d 146; and *State v. Runyon*, 06-823 (La.App. 3 Cir. 12/6/06), 944 So.2d 820, *writ denied*, 07-49 (La.9/21/07), 964 So.2d 330.

The convictions in this case arose from the same act or transaction,[16] or arose out of a common scheme or plan, a situation in which concurrent sentences are favored, especially for a first-time felony offender. However, the trial court noted that Defendant had a history of violence and that the officers suffered permanent injury as a result of the Defendant's actions. We find that it was not an abuse of discretion for the trial court to impose consecutive sentences.

## DECREE

For all of the foregoing reasons, Defendants convictions on two counts of battery of a police officer requiring medical attention are affirmed. The sentences are amended to delete the provisions denying eligibility for parole, probation, or suspension of sentence. The trial court is hereby ordered to note the amendments in the court minutes.

**CONVICTIONS AFFIRMED, SENTENCES AMENDED WITH INSTRUCTIONS.**

---

[16]In *State v. Runyon*, 06-823, p. 14 (La.App. 3 Cir. 12/6/06), 944 So.2d 820, 831, *writ denied*, 07-49 (La. 9/21/07), 964 So.2d 330, this court found that a manslaughter and aggravated battery which occurred during a fight "arose out of the same course of conduct."